## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

**Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

### MOTION INFORMATION STATEMENT

Docket Number(s): 23-1324     Caption [use short title]

Motion for: Dismiss Appeal For Lack of Jurisdiction

Set forth below precise, complete statement of relief sought:

Plaintiff-Appellee seeks dismissal of Defendants-

Appellants' Appeal because this Court does not have

jurisdiction over this appeal. The Southern District Of New

York has not issued a final order and Defendants -

Appellants have not otherwise certified the Southern

District of New York's August 24, 2023 Decision and Order.

Norris v. Goldner, et al.

MOVING PARTY: Alexander Norris     OPPOSING PARTY: Marc Goldner, et al.

[✓] Plaintiff     [ ] Defendant

[ ] Appellant/Petitioner     [✓] Appellee/Respondent

MOVING ATTORNEY: Saul Ewing LLP     OPPOSING ATTORNEY: Gerard Fox Law P.C.

[name of attorney, with firm, address, phone number and e-mail]

| | |
|---|---|
| 1270 Avenue of The Americas | 1880 Century Park East |
| Suite 2800 | Suite 1410 |
| New York, New York 10020 | Los Angeles, California 90067 |

Court- Judge/ Agency appealed from: Southern District Of New York - The Honorable Paul A. Engelmayer

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
[✓] Yes   [ ] No (explain):

Opposing counsel's position on motion:
[ ] Unopposed   [ ] Opposed [✓] Don't Know
Does opposing counsel intend to file a response:
[ ] Yes   [ ] No   [✓] Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**
Has this request for relief been made below? [ ] Yes [ ] No
Has this relief been previously sought in this court? [ ] Yes [ ] No
Requested return date and explanation of emergency:

Is oral argument on motion requested? [✓] Yes [ ] No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set? [ ] Yes [✓] No If yes, enter date:

Signature of Moving Attorney:
Christie McKune   Date: 10/11/2023     Service by: [✓] CM/ECF   [ ] Other [Attach proof of service]

# 23-1324-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



ALEXANDER NORRIS, DBA WEBCOMIC NAME,

*Plaintiff-Appellee,*

*v.*

GOLDEN BELL STUDIOS, LLC, MARC GOLDNER, INDIVIDUALLY, AS OFFICER
OF GOLDEN BELL ENTERTAINMENT, LLC, A CALIFORNIA COMPANY,
AS OFFICER OF GOLDEN BELL STUDIOS, LLC,
GOLDEN BELL ENTERTAINMENT, LLC, A CALIFORNIA COMPANY,

*Defendants-Appellants.*

_____

*On Appeal from the United States District Court
for the Southern District of New York*

## MOTION TO DISMISS APPEAL

Christie R. McGuinness
Francelina M. Perdomo Klukosky
SAUL EWING LLP
*Attorneys for Plaintiff-Appellee*
1270 Avenue of the Americas, Suite 2800
New York, New York 10020
212-980-7200



Plaintiff/Appellee Alexander Norris ("Norris" or "Appellee") moves pursuant to Federal Rule of Appellate Procedure 27 to quash and/or dismiss Defendants/Appellants' appeal, and in support states as follows:

## **INTRODUCTION**:

1. Appellee brought the underlying action against Defendants/Appellants Marc Goldner ("Goldner"), Golden Bell Entertainment, LLC ("Golden Bell Entertainment"), and Golden Bell Studios, LLC ("Golden Bell Studios") alleging, *inter alia*, copyright infringement, false designation of origin and cancellation of fraudulent registration. A copy of Appellee's Supplemental Complaint is attached hereto as **Exhibit A**.

2. On May 22, 2023, Hon. Judge Sarah Netburn of the United States District Court for the Southern District of New York issued a thorough, detailed Report and Recommendation resolving the issue of liability on several of Appellee's claims, and reserving decision on Appellee's remaining claims because Judge Netburn correctly found that there were genuine disputes of material fact precluding the entry of summary judgment (the "Report and Recommendation"). A copy of the Report and Recommendation is attached hereto as **Exhibit B**.

3. On August 24, 2023, Hon. Paul A. Engelmayer issued a thorough, detailed Opinion and Order adopting the majority of the Report and Recommendation, including the portion of the Report and Recommendation: 1)

finding that Defendants infringed upon Plaintiff's protected work, 2) finding that Defendants' trademark was properly subject to cancellation, and 3) finding that there were genuine disputes of material fact precluding the entry of summary judgment on several of Appellee's claims (the "Order"). A copy of the Order is attached hereto as **Exhibit C**.

4.    This appeal of the Report and Recommendation and the Order is improper for at least two reasons. One, **both** the Report and Recommendation and the Order are interlocutory orders not subject to appellate review, and as a result, the appeal must be quashed or dismissed.

5.    Second, as the Hon. Paul A. Engelmayer correctly identified in his September 25, 2023 Order, Appellants have not moved for certification under Fed. R. Civ. P. 54(b) of the Order (the "Docket Order") ("There is no question that the Court's August 24, 2023 opinion is one such order. Ordinarily, a district court's grant of partial summary judgment is not immediately appealable because it is not a final judgment. No final judgment has been entered as to any of Norris's claims. Nor have the defendants moved for certification under Rule 54(b) of those claims the Court has disposed of.") (internal citations and quotations omitted). Because this Court lacks jurisdiction over this Action, the appeal must be quashed or dismissed. A copy of the Docket Order is attached hereto as **Exhibit D**.

2

## <u>FACTUAL AND PROCEDURAL BACKGROUND</u>:

6.       Appellee filed the underlying Complaint in the United States District Court for the Southern District of New York on or about June 12, 2019. *See* Civ No. 1:19-cv-05491, Doc. No. 1. Appellee alleges, *inter alia*, that Appellants infringed upon their copyrighted material and that Appellants fraudulently filed and registered trademarks based on Appellee's copyrighted material. *See e.g.* Ex. A.

7.       On October 17, 2022, Appellee moved for partial summary judgment. *See* Civ. No. 1:19-cv-05491, Doc. Nos. 117-120.

8.       On November 16, 2022, Appellants crossed-moved for summary judgment, and filed their opposition to Appellee's partial motion for summary judgment. *See* Civ. No. 1:19-cv-05491, Doc. Nos. 122-129.

9.       On December 16, 2022, Appellee opposed Appellants' motion for summary judgment, and submitted their reply briefing in further support of their motion for summary judgment. *See* Civ. No. 1:19-cv-05491, Doc. Nos. 130-132.

10.     On January 6, 2023, Appellants filed their reply briefing in further support of their motion for summary judgment. *See* Civ. No. 1:19-cv-05491, Doc. Nos. 136.

11.     On January 31, 2023, the Hon. Paul A. Engelmayer referred the parties' cross-motions for summary judgment to the Hon. Sarah Netburn. *See* Civ. No. 1:19-cv-05491, Doc. Nos. 137.

12.    On April 19, 2023, the Hon. Sarah Netburn held oral argument on the parties' cross-motions for summary judgment. *See* Civ. No. 1:19-cv-05491, Doc. No. 139.

13.    On May 22, 2023, the Hon. Sarah Netburn issued the Report and Recommendation. *See* Ex. B.

14.    On August 24, 2023, the Hon. Paul A. Engelmayer issued the Order. *See* Ex. C.

15.    On September 22, 2023, Appellants filed a Notice of Appeal with the Southern District of New York in which Appellants state: "Notice is hereby given that Defendants Marc Goldner, Golden Bell Entertainment, LLC, and Golden Bell Studios, LLC, hereby appeal to the United States Courts of Appeals for the Second Circuit from the Order granting in part Appellee's Motion for Summary Judgment (Dkt. No. 150) entered on August 24, 2023, as well as the Report and Recommendation (Dkt. No. 146) entered on May 22, 2023." *See* 23-1324, Doc. No. 1.

16.    Appellants have not identified any jurisdictional grounds for this appeal in their filings with this Court.

## **GROUNDS FOR MOTION**:

17.    Appellants ask this Court to set aside the Report and Recommendation and the Order and allow this proceeding to remain in this Court (ignoring the pending

proceedings in the Southern District of New York) without articulating **any** statutory basis for appellate jurisdiction in this Court. As stated below, (a) there are no grounds upon which this relief can be afforded, as neither the Report and Recommendation nor the Order were a "final decision," and (b) this Court does not otherwise have jurisdiction over this Action because Appellants have not moved for certification under Fed. R. Civ. P. 54(b), so there is no justiciable controversy before this Court.

### The Report And Recommendation And The Order Are Not Reviewable Final Orders

18. Courts of Appeals have jurisdiction to hear appeals "from all final decisions of the district courts of the United States." 28 U.S.C. § 1291.

19. Recognizing the Court of Appeal's limited jurisdiction, it is well-understood that: "[o]rdinarily, a district court's grant of partial summary judgment is not immediately appealable because **it is not a final judgment**." *Geneva Pharms. Tech. Corp. v. Barr Lab'ys*., 386 F.3d 485, 495-96 (2d. Cir. 2004) (emphasis added).

20. As Hon. Paul A. Engelmayer correctly identified in this Docket Order, neither the Report and Recommendation nor the Order are final judgments because neither fully resolve Appellee's claims. *See* Exs. B and C. Specifically, on Appellee's claims for trademark infringement and for fraudulent registration, the Southern District of New York did not reach any decision as to Appellee's damages, and the Southern District of New York **specifically** found that it could not adjudicate

Appellee's (and Appellants') contract claims because there were genuine issues of material fact that precluded any such final adjudication. *See* Exs. B and C.

21.     Because Appellants have not identified the legal basis for this Court to hear their interlocutory appeal, it must be quashed or dismissed.

### *This Court Does Not Otherwise Have Jurisdiction*

22.     Fed. R. Civ. P. 54(b) provides: "[w]hen an action presents more than one claim for relief – whether as a claim, counterclaim, crossclaim, or third-party claim – or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court **expressly determines** that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R Civ. P. 54(b) (emphasis added).

23.     Here, neither the Report and Recommendation nor the Order expressly determine that there is no reason to delay an appeal to this Court, and in fact, the Hon. Paul A. Engelmayer expressly notified Appellants that the Southern District of New York intends to retain jurisdiction over this Action. *See* Ex. D.

24.     As a result, Appellants' sole remedy is in the Southern District of New York where the case is now being litigated, not before this Court.

## **CONCLUSION**:

25.     **WHEREFORE**, Appellee respectfully requests that the Court dismiss or quash this appeal and award Appellee their fees in filing this Motion.

Respectfully submitted this 11th day of October, 2023.

*/s/ Christie R. McGuinness*
Francelina M. Perdomo Klukosky, Esq.
Christie R. McGuinness, Esq.
Saul Ewing LLP
1270 Avenue of Americas, Suite 2800
New York, New York 10020
*Attorneys for Plaintiff-Appellee*
*Alexander Norris*

# Exhibit A

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEXANDER NORRIS d/b/a WEBCOMIC NAME<br><br>          Plaintiff,<br><br>          v.<br><br>Marc Goldner, Individually and as Officer of GOLDEN BELL ENTERTAINMENT, LLC, a California company and GOLDEN BELL STUDIOS, LLC, GOLDEN BELL ENTERTAINMENT, LLC., a California Company and GOLDEN BELL STUDIOS, LLC.<br><br>          Defendants. | **No. 1:19-cv-05491-AJN**<br><br>**ECF Case**<br><br>**SUPPLEMENTAL COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, complaining of the defendants, by and through his attorneys, CHINTA, PERDOMO, BERKS & FRATANGELO, LLP, alleges as follows:

### NATURE OF THE ACTION

1.      This action arises from a business dispute between a noted and respected visual artist and author, and an unethical, deceitful, and incompetent distributor and marketer of books, games, stories and similar goods.

2.      Plaintiff asserts claims for copyright and trademark infringement, false designation of origin, cancellation of trademark registrations, breach of contract, and declaratory judgment.

3.      This action is related to *Jason Wiseman d/b/a Jason Anarchy Games and Wiseman Innovation v. Marc Goldner, Golden Bell Entertainment LLC, and Golden Bell Studios LLC*, Case 1:19-cv-01282-AJN. The cases share multiple common facts and have identical defendants.

## THE PARTIES

4.      At all relevant times, plaintiff was a citizen and resident of the United Kingdom.

5.      Upon information and belief, at all relevant times defendant Marc Goldner ("Goldner") was a New York citizen and resident.

6.      Upon information and belief defendant, Golden Bell Entertainment, LLC ("GB Entertainment"), is a California limited liability company whose principal place of business is in Roslyn, New York, and transacts business in New York.

7.      Upon information and belief defendant, Golden Bell Studios, LLC ("GB Studios"), is a California limited liability company whose principal place of business is in Roslyn, New York, and transacts business in New York.

8.      Upon information and belief, Goldner is a member and officer of GB Entertainment and GB Studios.

9.      Upon information and belief, Goldner operates GB Entertainment and GB Studios interchangeably in business dealings, including written communications, negotiations, payments, and governmental filings.

10.     Upon information and belief GB Studios holds a license from GB Entertainment for assets it acquired from plaintiff that are the subject of this action.

11.     Upon information and belief, GB Entertainment uses the website http://www.goldenbellstudios.com as one of its online e-commerce sites.

12.     GB Studios is a necessary party only to the extent that any judgement or order affecting GB Entertainment's interest in plaintiff's property may affect GB Studios' interest in and to any agreement or license it has with GB Entertainment.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction under 28 U.S.C. §§1331, 1338, 15 U.S.C. §§ 1119, 1125(a), 17 U.S.C. § 501, 28 U.S.C. § 2201-02, and 28 U.S.C. § 1367(a).

14.     Upon information and belief, venue is proper in this district under 28 U.S.C. §1391 because defendants reside in this district.

## FACTUAL BACKGROUND

15.     Plaintiff is a visual artist, comics illustrator, and an author of short stories, webcomics, comic books and strips. He is the creative mind of the viral webcomic "Webcomic Name" which has captured the heart of over half a million social media followers with its main character, the disappointed "Blob."   The character's resigned "Oh No" phrase has become a recognizable mark, tapping into the current internet zeitgeist of self-conscious pessimism to hilarious and heartbreaking effect. See, Plaintiff's Declaration ("Declaration"), ¶ 3, 4.

16.     Plaintiff is the author and illustrator of the characters embodied in his webcomic "Webcomic Name." Id.

17.     Plaintiff's work has been featured on various webcomic sites such as *Comics Blog*, *Bored Panda*, *GoComics, It's Nice That* and *The Nib*. Mr. Norris' work is also well known in the United States. Id. ¶ 6.

18.     In 2016, plaintiff conceived the mark "Webcomic Name" and acquired the domain name http://www.webcomicname.com to promote his comics, illustrations, short stories and workshops. Since 2016, plaintiff has used the mark "Webcomic Name" to market and promote plaintiff's works. Id. Ex. 2.

19.     Plaintiff first launched "Webcomic Name" as a weekly webcomic strip featuring a distinctive character, the "Blob" which plaintiff conceived in 2015.  The character's

pessimistic "Oh No" punchline is an accompaniment and complementary phrase to the "Webcomic Name" comic strips as consumers of plaintiff's works associate "Oh No" with plaintiff's goods and services. Id., ¶ 4.

20.     Plaintiff actively sells and markets goods bearing his "Webcomic Name" and "Oh No" marks through his website http://www.theohnoshop.com. Id., Ex. 1.

21.     Plaintiff is also the creative mind behind "Dorris McComics," a pseudonym under which plaintiff writes and shares comics on and through social media, comics, and illustrations. Id., ¶ 3.

22.     In the summer of 2017, plaintiff and his editor negotiated a publishing agreement with Andrews McMeel Publishing, LLC, a United States publisher ("McMeel") to publish a compilation of plaintiff's "Webcomic Name" comics.  On April 2, 2019, McMeel published plaintiff's book entitled "Oh No." Id., ¶ 12.

23.     In early 2017, Jason Wiseman ("Wiseman"), a table card game creator and self-publisher based in Canada, approached plaintiff to discuss a mutually beneficial collaboration in a table card game incorporating elements of plaintiff's webcomic "Webcomic Name" (hereinafter the "Game"). Id., ¶ 8.

24.     Since the Game would incorporate the style, concept and characters of plaintiff's "Webcomic Name" comics, plaintiff and Wiseman used *Webcomic Name Game* as a placeholder. Id.

25.     Plaintiff and Wiseman planned to jointly publish the Game via Kickstarter and commercialize it through Wiseman's distribution channels. Id., ¶ 8.

26.     Wiseman told plaintiff he had discussed publishing and distributing the Game with defendants. Id., ¶ 9.

27.     Plaintiff and Wiseman agreed defendants would publish and distribute the Game through their larger distribution network and business infrastructure because it would lead to substantially greater sales than if they self-published. Id., ¶ 10.

28.     Wiseman signed an agreement with defendants to create and deliver them four games, three of which, including the Game, were either in their conceptual or development phase.  Plaintiff was not a party to Weisman's contract. Id., ¶ 11.

29.     On July 3, 2017 GB Entertainment sent plaintiff a proposed Collaboration Agreement. Id., ¶ 14, Ex. 5.

30.     Plaintiff told Goldner in writing that since the Game "will heavily feature elements that are part of Webcomic Name already," he wanted "to make it clear that in no way does Golden Bell take ownership of any of the characters, images or story content except in its application in a tabletop game." Id., ¶¶ 14,15, Ex. 4.

31.     Plaintiff also told Goldner that he was working with publishers on a book featuring "Webcomic Name" elements and that he wanted to ensure that their agreement would not interfere with the publishing contract. Id.

32.     On July 11, 2017, Goldner told plaintiff he was "in the free to and clear to work on your property outside of the context of our contract," explained that the contract is specifically for the "game" and stuffed animal, and added to the agreement the following language: "Artist has the right to pursue his Comic "Webcomic Name" outside of the context of this agreement". Id., ¶ 15, Ex. 4.

33.     Because of Goldner's written statements, plaintiff reasonably believed the scope of the Collaboration Agreement was limited to his work as an illustrator and that it did not grant or transfer any rights to his past, present, and future works, including plaintiff's

trademarks.  Id., ¶¶ 16, 17.

34.    Plaintiff and GB Entertainment signed their Collaboration Agreement on August 10, 2017. Id., Ex. 5.

35.    The Collaboration Agreement states that plaintiff is "known as Alex Norris of Webcomic Name." Id., Ex. 5 ¶ 1G.

36.    At the time the Collaboration Agreement was signed, plaintiff had yet to illustrate Game and the plush toy. Id., ¶ 18.

37.    In exchange for the right to use plaintiff's illustrations in the Game, GB Entertainment agreed to advance of $3,125.00 to plaintiff within 30 days of delivery of the final files of the Game and another advance of $2,500.00 upon delivery of the final print-ready files, the PSD files, the AI files and the InDesign Files.  GB Entertainment also agreed to pay plaintiff 10% of net royalties and deliver to him 725 copies of the Game. Id., ¶ 21, Ex. 5 ¶ 1G.

38.    Plaintiff delivered the final 400 illustrations panels to defendants on October 2, 2018, and the final Game files on November 2, 2019. Id., ¶ 19, Ex. 6.

39.    GB Entertainment does not dispute it is pre-selling copies of the Game and using plaintiff's marks in commerce. Id. Exhibits 7B, 9, 10 and 14,

40.    GB Entertainment and GB Studios are using the website http://www.goldenbellstudios.com to actively sell merchandise bearing plaintiff's marks including the plush toys "Sexy Blob",  the "OH NO" pillow, and the "Webcomic Name Plush".  Id., Ex. 16.

41.    Upon information and belief, defendants are selling merchandise bearing plaintiff's marks at toy conventions. See Id., Ex. 16, p. 4. (GB Studios stand at Pax East).

42.    GB Entertainment did not pay plaintiff's advances or deliver copies of the

Game.  Id., ¶ 20.

**Plaintiff's Copyrighted Works**

43.     Plaintiff's artistic portfolio in connection to his "Webcomic Name" trademark and illustrations is available to the general public through the website http://webcomicname.com.

44.     Plaintiff is the sole author and exclusive rights holder of his original illustrations registered with the United States Copyright Office under registration No. VA 2-128-773 (the "Registered Works"). Id., Ex. 3.

45.     Plaintiff is the sole author and exclusive rights holder to original illustrations created or published for the first time in the United Kingdom ("Foreign Works"). Id., Ex 15.

46.     The Registered Works and the Foreign Works are plaintiff's Copyrighted Works and are part of his intellectual property portfolio. Id. ¶¶ 31-34.

47.     Goldner and GB Entertainment had access to plaintiff's Copyrighted Works through plaintiff's public website and social media sites. Id., ¶ 31.

48.     Goldner and GB Entertainment deliberately, willfully and without authorization, reproduced plaintiff's Copyrighted Works from his Facebook page and used them as specimens of use for its applications Serial. Nos. 88185795, 88147369, and 87703934 for the marks "Webcomic Name" and "OH NO," respectively. Id., Exhibits, 7, 7B, 9 and 10.

49.     Goldner and GB Entertainment deliberately, willfully and without authorization, reproduced plaintiff's Copyrighted Works from his Facebook page and used them to market and sell plush toys on defendants' website http://www.goldenbellstudios.com.  Id., Ex. 16.

<u>**GB Entertainment's "Webcomic Name" Application Serial No. 87703934**</u>

50.     On November 30, 2017, Goldner and GB Entertainment filed a trademark application Serial No. 87703934 ("934 Application") on an intent to use basis for the mark "Webcomic Name" in class 028 (Board games; Card games; Game cards; Party games; Plush dolls; Plush toys; Stuffed dolls and animals; Stuffed toy animals; Tabletop games; Soft sculpture plush toys; Stuffed and plush toys). Id., Ex. 7.

51.     The application stated that applicant had a "bona fide intention and is entitled, to use the mark in commerce on or in connection with the identified goods/services.   Id.

52.     Defendants filed the application without plaintiff's knowledge and consent and before plaintiff had finalized and delivered the illustrations for the Game and plush toy. Id., ¶¶ 19, 22.

53.     Goldner and GB Entertainment made false statements and submissions to the USPTO in the 934 Application, to wit:

i.     GB Entertainment is the owner of the mark.

ii.     To the best of their  "knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive."

iii.     All of the facts recited in the application were accurate.

54.     Goldner and GB Entertainment made these statements with actual knowledge that (i) the Collaboration Agreement did not mention an assignment of the mark "Webcomic Name", but referred to an assignment of the copyrights in a game *tentatively*   entitled

"Webcomic Name Game" and a plush toy *tentatively* entitled  "Webcomic Name Stuffed Animal"; (ii) he proposed to include a provision stating that plaintiff retained "the rights to pursue his comic Webcomic Name outside of the context of this agreement."; (iii) at the time the applications were submitted, plaintiff was using his "Webcomic Name" mark and commerce in relation to goods and services including comic strips, illustrations and t-shirts, others, and services, and his work was associated with the mark "Webcomic Name". Id., Ex. 5.

55.     On October 9, 2018, Goldner and GB Entertainment filed statements of use for the 934 Application, and reiterated the statements made in the initial application and further attested to the following:

    i.     GB Entertainment's  first use of the was as early as June 26, 2016 and that it first used the mark in commerce in connection to Board games; Card games; Game cards; Party games; Plush dolls; Plush toys; Stuffed dolls and animals; Stuffed toy animals; Tabletop games; Soft sculpture plush toys; Stuffed and plush toys on July 12, 2017.

    ii.     the mark was in use in commerce at the time of the statement in connection with all the goods/services in the application.

    iii.     that all of the facts recited in the application are accurate. Id. Ex. 8.

56.     Goldner and GB Entertainment knew that these statements were false because the final Game files were not yet delivered. Id.,¶ 19.

57.     On December 11, 2018, as a result of Goldner's misrepresentations, the USPTO approved the 934 Application, and issued GB Entertainment, Registration No. 5629281 for "Webcomic Name."  Id. Ex. 8.

### Golden Bell "Webcomic Name" Application Serial No. 88147369

58.     On October 9, 2018, Goldner and GB Entertainment filed an application Serial Number 88147369 ("369 Application") for the mark "Webcomic Name," in International Class 016 (Comic books; Comic strips; Comic strips' comic features; Comics; Newspaper comic strips), and International Class 025 (T-shirts). Id. Ex., 9.

59.     Upon filing the 369 Application, Goldner and GB Entertainment stated:

i.   GB Entertainment is the owner of the trademark sought to be registered.

ii.   To the best of their "knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive."

iii.   GB Entertainment's first use the mark in commerce as early as June 26, 2016 in connection with Comic books; Comic strips; Comic strips' comic features; Comics; Newspaper comic strips and T-shirts on June 26, 2016.

iv.   The mark was in use in commerce at the time of the application.

v.   All of the facts recited in the application were accurate.

60.     Goldner and GB Entertainment made these statements with the knowledge that they were false.

61.     Goldner and GB Entertainment knew that: (i) plaintiff did not agree to assign his mark "Webcomic Name" to defendants; (ii) Goldner proposed to include a provision stating that plaintiff  retained "the rights to pursue his comic Webcomic Name outside of the context of this agreement."; (iii) that plaintiff was using the  "Webcomic Name" mark in

commerce in relation to these very same goods, comic strips and t-shirts, among others, and his work was associated with the mark "Webcomic Name" due to plaintiff's popularity and the fact that the Agreement  itself acknowledges that plaintiff is "known as Alex Norris of Webcomic Name," (iv) Goldner knew that plaintiff was releasing a book related to "Webcomic Name" and expressly requested assurances from Goldner about the limited scope of the Agreement.  Id., Ex. 5.

62.     The 369  Application is currently pending registration. Id., ¶ 25.

### Golden Bell's application for the mark "OH NO" Serial Number 88185795

63.     On November 8, 2018, Goldner and GB Entertainment filed an application, serial number 88185795 ("795 Application"). This time they attempted to register plaintiff's comedic trademark punchline "Oh No". Id. Ex, 10.

64.     Goldner, as principal of Goldner Bell filed the 795 Application for "Oh No" in class 016 (Bookmarkers; Bookmarks; Comic books; Comic magazines; Comic strips; Comic strips' comic features; Comics; Stickers; Newspaper comic strips), and class 025 (T-shirts; Graphic T-shirts; Short-sleeved or long-sleeved t-shirt). Id.

65.     Upon filing the application, Goldner and GB Entertainment stated:

  i.    GB Entertainment is the owner of the mark;

 ii.    That to the best of their "knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive."

iii.  GB Entertainment's first's use of the Mark was as early as June 26, 2016 and that it first used the mark in commerce in connection to Bookmarkers; Bookmarks; Comic books; Comic magazines; Comic strips; Comic strips' comic features; Comics; Stickers; Newspaper comic strips and T-shirts; Graphic T-shirts; Short-sleeved or long-sleeved t-shirts on June 26, 2016.

iv.  The mark was in use in commerce at the time of the application in connection with all the goods/services in the application.

v.  That all of the facts recited in the application were accurate.

66.    Goldner and GBE made these statements knowing they were false. Indeed, Goldner knew that: (i) plaintiff never assigned his rights to his "Oh No" trademark to any of the defendants, in fact, in fact the agreement does not even mention the mark; (ii) defendants have never used the mark in connection to the applied for goods; (iii) the specimens of use submitted were screenshots of plaintiff's Facebook page and plaintiff's webcomicname.com website.

67.    Goldner and GB Entertainment filed this application without plaintiff's knowledge or consent. Id., ¶26

68.    The USPTO has since divided the 795 Application as Serial No. 88975215 and 88185795 and are currently pending registration. Id., ¶27.

69.    On November 18, 2019, Golden Bell filed with the USPTO another specimen of use in support of its 88185795 application ("New Specimen for 795 Application").

70.    Goldner, as principal of Goldner Bell filed the New Specimen for 795 Application in class 016 (Bookmarkers; Bookmarks; Comic books; Comic magazines; Comic strips; Comic strips' comic features; Comics; Stickers; Newspaper comic strips).

71.     Upon filing the New Specimen for 795 Application, Goldner and GB Entertainment stated:

  i.     GB Entertainment is the owner of the mark;

  ii.    That to the best of their "knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive."

  iii.   GB Entertainment's first's use of the Mark was as early as June 26, 2016 and that it first used the mark in commerce in connection to Bookmarkers; Bookmarks; Comic books; Comic magazines; Comic strips; Comic strips' comic features; Comics; Stickers; Newspaper comic.

  iv.    The mark was in use in commerce at the time of the application in connection with all the goods/services in the application.

  v.     That all of the facts recited in the application were accurate.

72.     Goldner and GBE made these statements knowing they were false. Indeed, Goldner knew that: (i) plaintiff never assigned his rights to his "Oh No" trademark to any of the defendants, in fact, in fact the agreement does not even mention the mark; (ii) defendants have never used the mark in connection to the applied for goods; (iii) the specimens of use submitted were screenshots plaintiff's copyrighted works "Different," "Imagination," "Impossible," and "Procrastination," and were taken directly from plaintiff's website theohnoshop.com without his knowledge or authorization.

73.     Goldner and GB Entertainment filed the New Specimen for 795 Application

without plaintiff's knowledge or authorization.

**Plaintiff Applies for His Own Webcomic Name Serial No. 88216127**

74.     On November 2018, plaintiff filed an application, serial number 88216157

("127 Application") for *Webcomic Name* in class 041 (providing online non-downloadable

webcomics and comic strips, books, reviews, periodicals and magazines in international class),

and class 016 (for comic books; comic strips and comic strip's comic features, appearing in

print media, namely, comic books, books, newspapers, magazines). <u>Id</u>., Ex. 11.

75.     The USPTO denied the 127 Application because of the likelihood of

confusion with Goldner's and GB Entertainment's fraudulent 934 Application, which it

granted. <u>Id</u>., Ex. 8.

76.     On March 25, 2019 plaintiff commenced a cancellation proceeding before the

Trademark Trial and Appeal Board in connection to GB Entertainment's Registration No.

5629281 for "Webcomic Name" in International Class 28.  See Exhibit 15 to Plaintiff's

Declaration. <u>Id</u>., Ex. 13.

77.     On March 28, 2019, defendant's counsel sent a cease and desist letter to

plaintiff's publisher demanding it refrain from publishing plaintiff's book, and claiming *inter*

*alia,* that its publication of "Oh No" infringed defendants marks including "Webcomic Name."

<u>Id.,</u> Ex. 17.

78.     On March 29, 2019, defendant's counsel also sent cease and desist letter to

plaintiff's counsel in this case claiming that GB Entertainment was the rightful owner of the

"Webcomic Name," had trademark rights to the name "Oh No," and that plaintiff's copyright

registration for his illustrations and webcomics was invalid. <u>Id</u>. Ex. 18.

79.     There is no mention in the Collaboration Agreement of the mark "Oh No"

which is the punchline that The Blob character delivers in every single of plaintiff's

"Webcomic Name" comic strips. Id. Ex. 5.

80.     On April 4, 2019, defendants counsel sent a second letter to plaintiff and his

publisher. Id., Ex. 19.

81.     Plaintiff's publisher nevertheless published the "Oh No" book on April 2,

2019.


**AS AND FOR A FIRST CAUSE OF ACTION
COPYRIGHT INFRINGEMENT
(against GB Entertainment and Goldner)**

82.     Plaintiff repeats and realleges each and every allegation of the foregoing

paragraphs of its Complaint, with the same force and effect as if set forth fully herein.

83.     Plaintiff is a British citizen and at all relevant times was a resident and

domiciliary of the United Kingdom.

84.     Under the law of Great Britain plaintiff owns the copyrights in his

illustrations, copyright protection lasts 70 years from the death of the author, and copyright

registration is not required for enforcement of a copyright owner's rights.

85.     Plaintiff's Registered Works are registered under U.S. Registration No.

VAu 1-337-956.

86.     Plaintiff's Foreign Works are not United States works as defined by 17

U.S.C. §101 because they were published for the first time outside the United States or are

unpublished.

87.     Plaintiff did not consent to, authorize, permit or allow in any manner

defendants' use of plaintiff's Copyrighted Works.

88.     With knowledge of plaintiff's ownership of the illustrations constituting the Copyrighted Works, Goldner and GB Entertainment deliberately and willfully infringed plaintiff's copyrights.

89.     Goldner and GB Entertainment had access to plaintiff's Copyrighted Works through his publicly available website and social media sites.

90.     Goldner and GB Entertainment copied plaintiff's Copyrighted Works and submitted them as specimens used in support of their 795 Application and 369 Application for the marks "Webcomic Name" and "Oh No."  Id.

91.     GB  Studios also reproduced Illustration #1 to promote merchandize on its website http://www.goldenbellstudios.com and at conventions (for instance at the PAX East Convention) without plaintiff knowledge or consent.

92.     Goldner and GB Entertainment's infringement was willful and was done in furtherance of their fraudulent trademark applications.

93.     Plaintiff has copyrighted his comic strips "Different", "Dog", "Imagination", "Impossible" and "Procrastination" with the United States Copyright Office and holds a registration No. VA 2- 128-773  (the "Registered Works"). Id., Ex. 3.

94.     On November 18, 2019, five months after Plaintiff filed his original complaint in this action, Golden Bell filed another fraudulent specimen of use with the USPTO, whereby Goldner copied the copyrighted works "Different", "Imagination", "Impossible" and "Procrastination" directly from Plaintiff's website theohnoshop.com without Plaintiff's knowledge or authorization. Exhibit 2 to Declaration in Support of Supplemental Pleadings, p.12.

95.     Goldner and GB Entertainment's infringement was willful and was done in

furtherance of their fraudulent trademark applications.

96.     Plaintiff is entitled to injunctive relief, actual damages, and lost profits as a result of defendants' actions in connection to plaintiff's Foreign Works; additionally, plaintiff is entitled to injunctive relief, statutory damages, attorneys' fees and the costs of this action in connection to plaintiff's Registered Works.

**AS AND FOR A SECOND CAUSE OF ACTION
FOR FALSE DESIGNATION OF ORIGIN
(Against GB Entertainment and GB Studios)**

97.     Plaintiff repeats and realleges each and every allegation of the foregoing paragraphs of its Complaint, with the same force and effect as if set forth fully herein.

98.     Plaintiff is the owner of the marks "Webcomic Name" and "Oh No." He conceived and developed both marks and the public associates these marks with plaintiff's goods and services.

99.     Plaintiff did not assign and never intended to assign to GB Entertainment or GB Studios his rights in and to "Webcomic Name" and "Oh No."

100.    The Collaboration Agreement does not mention or address "Oh No" in any way, and does not and cannot transfer the mark "Webcomic Name", but GB Entertainment nevertheless filed applications with the USPTO falsely claiming use of the mark in commerce, and supported its "use" with examples of plaintiff's own use. These actions indicate an unequivocal intent to misappropriate plaintiff's trademarks.

101.    GB Entertainment did not dispute that it has received pre-orders of the Game and is commercializing the Game and plush toys and using the mark in commerce.

102.    Upon information and belief, defendants are using the website

17

http://www.goldenbellstudios.com to actively sell merchandise bearing plaintiff's marks, including the plush toys "Sexy Blob",   the "OH NO" pillow, and the "Webcomic Name Plush".

103.    Upon information and belief, defendants are also selling merchandise bearing plaintiff's marks at toy conventions.

104.    Plaintiff actively sells and markets goods bearing his "Oh No" mark at his website www.theohnoshop.com.

105.    Plaintiff's "Webcomic Name" and  "Oh No" trademark are identical to the marks GB Entertainment applied for and registered because the goods and services are the same or closely related, which actually causes consumer confusion as to the true source because the goods are marketed to the same consumers.

106.    Plaintiff has been injured by defendants' unauthorized and willful infringing use of his marks and is entitled to damages, injunctive, and equitable relief.

### AS FOR A THIRD CAUSE OF ACTION
### FOR CANCELLATION OF FRAUDULENT REGISTRATIONS
### (Against Goldner and Golden Bell)

107.    Plaintiff repeats and realleges each and every allegation of the foregoing paragraphs of its Complaint, with the same force and effect as if set forth fully herein.

108.    15 U.S.C. § 1119 provides that:

In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action. Decrees and orders shall be certified by the court to the Director, who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby.

109.    On November 30, 2017, defendants filed the 934 Application without

plaintiff's knowledge or consent.

110.    At the time the parties signed the Collaboration Agreement, plaintiff was in the process of illustrating the Game for defendants (tentatively entitled "Webcomic Name Game"), and the plush toys did not have a working name (it was tentatively entitled "Web Comic Name Stuffed Animals").

111.    The Game was tentatively entitled *Webcomic Name Game* because it was inspired by plaintiff's popular webcomic name comic strip and brand and was to be marketed as illustrated "by Alex Norris of Webcomic Name."

112.    Plaintiff never intended to transfer rights on his "Webcomic Name" trademark as evidenced by the July 3, 2017 exchange between the parties.

113.    Plaintiff could not transfer trademark rights to *Webcomic Name Game* or the plush toy to defendants because at the time of the Collaboration Agreement, neither the Game nor the toy was in existence and trademark rights could not attach.

114.    The 934 Application was filed on an intent to use basis *precisely because* the mark was not in use at the time of the application, let alone at the time the Collaboration Agreement was signed.

115.    Any purported or attempted assignment of the mark to defendant under the Collaboration Agreement fails as a matter of law since that would be considered an in gross transfer of rights.

116.    GB Entertainment did not have the right or authority to apply for the mark or to tack its date of first use back to the date of plaintiff's first use.

117.    As a result of Goldner's misrepresentations to the USPTO, it granted the 934 Application and on December 11, 2018, issued "Webcomic Name" Registration No.

5629281.

118.    On March 25, 2019, plaintiff filed a petition to cancel GB Entertainment's registrations.

119.    GB Entertainment moved to dismiss the petition, stating that "the Board has not been Statutorily Authorized to Determine the Scope and Validity of the … Collaboration Agreement."

120.    GB Entertainment is not entitled to this registration because it is not the rightful owner of the marks.

**AS FOR A THE FOURTH CAUSE OF ACTION**
**FOR BREACH OF CONTRACT**
**(against GB Entertainment)**

121.    Plaintiff repeats and realleges each and every allegation of the foregoing paragraphs of its Complaint, with the same force and effect as if set forth fully herein.

122.    GB Entertainment breached the Collaboration Agreement by failing to pay the required advances in full, deliver copies of the Game, commercialize the works, and otherwise.

123.    GB Entertainment agreed to pay plaintiff $3,125, within 30 days of delivery of the final Game files, and $2,500, upon delivery of the final print-ready files, the PSD files, the AI files and the InDesign Files. Id at 1G.

124.    GB Entertainment promised to give plaintiff 725 complementary copies of the Game.

125.    On October 2, 2018, plaintiff delivered the files to GB Entertainment.

126.    GB Entertainment failed to pay plaintiff's advances and deliver copies of the Game as agreed.

127.     GB Entertainment owes plaintiff $5,625.00 in advances, 725 copies of the Game and royalties.

WHEREFORE, Plaintiff respectfully requests an award of compensatory damages in an amount to be determined at trial as a result of Golden Bell's material breach of the Agreement.

### AS FOR A FIFTH CAUSE OF ACTION
### FOR A DECLARATORY JUDGMENT
### (Against GB Entertainment and GB Studios)

128.     Plaintiff repeats and realleges each and every allegation of the foregoing paragraphs of its Complaint, with the same force and effect as if set forth fully herein.

129.     The Collaboration Agreement is specifically for the Game and a plush toy.

130.     Plaintiff believed and understood that the Collaboration Agreement only covered the Game and a plush toy, and asked Goldner to acknowledge that it did not prevent him from using his characters and working with collaborators on unrelated projects.

131.     On or about July 11, 2017 plaintiff asked Goldner to confirm that the scope of the Agreement would be limited the Game and one plush toy as follows:

"The main query I have about the contract is the part about 'the artist will retain 0% of the copyright" and similar clauses. Obviously the game will heavily feature elements that are part of Webcomic Name already, and I want to make it clear that in no way does Golden Bell take ownership of any of the characters, images or story content except in its application in a tabletop game. At the moment the wording is very broad and could apply to Webcomic Name in general, rather than simply in relation to a tabletop game."  Id. Ex. 6.

132.     In response, Goldner sent the following email to plaintiff on July 11, 2017:

"Hey Alex! I am resending the contract with now with this new language and also specified its for game and stuffed animal.

A.     ARTIST has the right to pursue his Comic "Webcomic Name" outside of the context of this agreement." Id.

133.    Plaintiff informed Goldner prior to executing the Collaboration Agreement that he was working on a Webcomic Name book and needed to confirm that Goldner understood that GB Entertainment could not affect his work outside of the Game and the plush toy.

134.    On July 11, 2017, plaintiff told Goldner:

"I will be working with publishers on a book and I am going to send them a copy of the contract before signing to make sure there is no breach of my contract with them. Obviously the book and tabletop game are very separate but will contain the same elements and I don't want signing this contract to come back to bite me in the future!" Id.

135.    Goldner replied to plaintiff that same day and said that plaintiff was "in the free to and clear to work on your property outside of the context of our contract", which plaintiff words was for a game and a plush toy. Id.

136.    Goldner knew or expected or should reasonably have known or expected that plaintiff would rely on his statements in executing the Collaboration Agreement.

137.    Plaintiff executed the Collaboration Agreement in good faith and relying on Goldner's written assurances.

138.    Plaintiff would not have entered into the Collaboration Agreement but for Goldner's statements confirming plaintiff's understanding regarding the scope of the Collaboration Agreement.

139.    Subsequent to Goldner's confirmation, Goldner and GB Entertainment told plaintiff they owned an option to plaintiff's future works.

140.    This statement was grossly inaccurate and misstated the terms and intentions of the Collaboration Agreement.

141.    GB Entertainment has asserted multiple times in writing that the

Collaboration Agreement also covers plaintiff's books, comic strips, his valuable trademarks "Webcomic Name" and "Oh No," and the merchandise associated with plaintiff's works including t-shirts.

142.    The text of the Collaboration Agreement is also vague, confusing, and contradictory in material respects.

143.    Sections 1A, IB, and 1H of the Collaboration Agreement each provide different, conflicting, and in some cases mutually exclusive rights and privileges regarding what property is transferred or retained.

144.    Based on these facts, there is now uncertainty, insecurity, and controversy between the plaintiff and GB Entertainment as to the scope, meaning, and interpretation of the Collaboration Agreement, and a judicial declaration of the respective rights and obligations of the parties will clarity and settle their legal relations.

145.    GB Entertainment has already told the USPTO that "the Board has not been Statutorily Authorized to Determine the Scope and Validity of the ... Collaboration Agreement."

146.    Only this Court can provide the required relief to the parties.

**WHEREFORE**, plaintiff respectfully requests that this Court:

1.    On the First Cause of Action, awarding plaintiff a money judgment for actual damages, lost profits; and

2.    On the First Cause of Action, enjoining defendants from continuing to use the copyrighted material without plaintiff's consent; and

3.      On the Second Cause of Action, awarding monetary damages to plaintiff in an amount to be determined at trial as a result of defendants' willful infringement of plaintiff's trademarks resulting from defendants' profits in exploiting plaintiff's marks.

4.      On the Second Cause Action, issuing a permanent injunction preventing Goldner and GB Entertainment from using the "Webcomic Name" mark or anything confusingly similar thereto; enjoining Goldner and GB Entertainment from using any false designation or representation of origin in connection with the offering for sale or sale of goods and under the "Webcomic Name" and "Oh No" marks or any false description or representation, including words or other symbols, tending falsely to describe or represent defendants as "Webcomic Name" or associated or connected to "Webcomic Name" or "Oh No"; Order Goldner and GB Entertainment to implement corrective advertising rectifying the false statements in all their sales, marketing and distribution channels or avenues and remove any references to plaintiff's "Webcomic Name" and "Oh No" marks; and

7.      On the Third Cause of Action, ordering the cancellation of  U.S. trademark Registration No. 5629281, pursuant to 15 U.S.C. § 1119; and

8.      On the Fourth Cause of Action, awarding plaintiff a money judgment against Golden Bell Entertainment, LLC in an amount to be proven at trial, plus interest as allowed by law; and

9.      On the Fifth Cause of Action, a judicial declaration of the respective rights and obligations of the parties respecting the agreements between the parties that are the subject of this action, reform or rescind same; and

10.     Awarding plaintiff legal fees, cost, and disbursements; and

11.    Granting plaintiff such other and further relief as to the Court is just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury pursuant to FRCP 38.

Dated: New York, New York
        August 3, 2020

                                    GALLET DREYER &
                                    BERKEY, LLP


                                    _____/s/_____
                                    Francelina M. Perdomo (#4429)
                                    Antoaneta Tarpanova (#2287)
                                    845 Third Ave., 5th floor
                                    New York, NY 10022
                                    fmp@gdblaw.com
                                    at@gdblaw.com

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────────────────────X

ALEXANDER NORRIS,

                              Plaintiff,

              -against-

MARC GOLDNER, et al.,

                              Defendants.

───────────────────────────────X

```
┌─────────────────────────────┐
│ USDC SDNY                    │
│ DOCUMENT                     │
│ ELECTRONICALLY FILED         │
│ DOC #:_____        │
│ DATE FILED:__ 5/22/2023 _    │
└─────────────────────────────┘
```

19-CV-05491 (PAE)(SN)

**REPORT AND
RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE PAUL A. ENGELMAYER:**

Alexander Norris ("Plaintiff") sues Marc Goldner, Golden Bell Entertainment, LLC ("GB Entertainment"), and Golden Bell Studios, LLC ("GB Studios," and collectively, "Defendants") for five causes of action arising out of a contract executed by the parties and various related trademark registrations. These claims include copyright infringement, false designation of origin, breach of contract, cancellation of GB Entertainment's U.S. Patent and Trademark Office ("USPTO") Registration No. 5629281, and declaratory judgment regarding the scope and content of the agreement executed by the parties. Plaintiff moved for summary judgment, and Defendants cross-moved for summary judgment on all claims.

I recommend that Plaintiff's motion for summary judgment be GRANTED in part, and Defendants' cross-motion for summary judgment be DENIED.

## BACKGROUND

### I.      Factual Background

Plaintiff, a British citizen and resident, is a comics illustrator and the creator of the

webcomic and associated brand "Webcomic Name," whose main character "Blob" utters the

signature phrase "Oh No" in each comic's final panel. ECF No.129 Pl. 56.1 ¶¶ 2-5.[1] Plaintiff

created Blob in 2015 and formally launched Webcomic Name in 2016. Id. ¶¶ 5-6. That same

year, Plaintiff created an online marketplace selling merchandise related to Webcomic Name. Id.

¶ 9.



Pl. 56.1 ¶ 58.

In early 2017, Plaintiff and non-party Jason Wiseman agreed to collaborate and create a

tabletop card game (the "Game") based on Webcomic Name. Id. ¶ 12. The duo initially planned

to self-publish using Kickstarter, id. ¶ 14, but Wiseman later proposed using Defendants to

publish and distribute the Game. Id. ¶ 15. On February 11, 2017, Wiseman executed an

---

[1] Citations to "Pl. 56.1" refer to ECF No. 129, which collates Plaintiff's initial Rule 56.1 Statement in
support of its motion for summary judgment and Defendants' responses to each statement. Citations to
"Def. 56.1" refer to ECF No. 132, which collates Defendants' counterstatement of facts and Plaintiff's
responses to each statement.

agreement with GB Entertainment in which they agreed to purchase four games from Wiseman, including the Game. Id. ¶ 16.

On June 26, 2017, Goldner contacted Plaintiff directly about an agreement (the "Agreement") between Plaintiff and GB Entertainment. Id. ¶ 22. After some negotiation, the Agreement was executed on August 10, 2017. Id. ¶ 27. Under the Agreement, Plaintiff agreed to illustrate the Game and assigned certain rights in their creations relating to it to Defendants. In return, Plaintiff would receive a percentage of the net sales of the Game and related products. See Agreement, ECF No. 116-8.

Plaintiff was also entitled to a "$3,125 upfront advance against net sales royalties within 30 days of [GB Entertainment] receiving the final files noted above for [the Game.]" Agreement § 1(G). The parties dispute whether these files were ever sent, but do not dispute that the advance was never paid to Plaintiff. Pl. 56.1 ¶ 35.

On November 30, 2017, GB Entertainment filed application No. 87703934 to register the trademark "Webcomic Name" in international class 028 ("Board games; Card games; Game cards; Party games; Plush dolls; Plush toys; Stuffed dolls and animals; Stuffed toy animals; Tabletop games; Soft sculpture plush toys; Stuffed and plush toys"). Pl. 56.1 ¶ 36; ECF No. 119-7. On December 11, 2018, the USPTO approved GB Entertainment's application and issued registration No. 5629281 (the "'281 Mark"). Pl. 56.1 ¶ 44; ECF No. 1-10.

On October 9, 2018, GB Entertainment filed application No. 88147369 to register the trademark "Webcomic Name" in international class 016 ("Comic books; Comic strips; Comic strips' comic features; Comics; Newspaper comic strips") (the "'369 Application"). Pl. 56.1 ¶ 46; ECF No. 1-11. On November 8, 2018, GB Entertainment filed application No. 88185795 to register the trademark "Oh No" in international classes 016 ("Bookmarkers; Bookmarks; Comic

books; Comic magazines; Comic strips; Comic strips' comic features; Comics; Stickers; Newspaper comic strips"), 025 ("T-shirts; Graphic T-shirts; Short-sleeved or long-sleeved t-shirts"), and 028 ("Plush toys; Stuffed toy animals; Stuffed and plush toys; Toy stuffed animals") (the "'795 Application"). Pl. 56.1 ¶ 50; ECF No. 1-12.

The parties dispute when Plaintiff first learned of these applications, Pl. 56.1 ¶ 54, but at some point Plaintiff filed application No. 88216127 to register the trademark "Webcomic Name" in international class 016 ("Comic books; Comic strips and comic strip's [sic] comic features, appearing in print media, namely, comic books, books, newspapers, magazines"). Pl. 56.1 ¶ 55; ECF No. 1-13. On March 6, 2019, the USPTO rejected Plaintiff's application because of the likelihood of confusion with the '281 Mark, held by GB Entertainment. Pl. 56.1 ¶ 56; ECF No. 1-14.

On March 25, 2019, Plaintiff filed a petition with the USPTO Trademark Trial and Appeal Board to cancel the '281 Mark. Pl. 56.1 ¶ 57; ECF No. 1-15. That proceeding is stayed pending the outcome of this action. Pl. 56.1 ¶ 57. On March 29, 2019, Defendants' then-counsel wrote to Plaintiff's counsel "claiming that Golden Bell was the rightful owner of the 'Webcomic Name,' that Golden Bell had acquired trademark rights over the mark 'Oh No,' and that the copyright registration of Norris's webcomic strips compilation was invalid." Pl. 56.1 ¶ 67. On April 1, 2019, Plaintiff's counsel responded that Plaintiff was terminating the Agreement for cause, as "Golden Bell is improperly attempting to use the Collaboration Agreement as a vehicle to misappropriate the intellectual property rights belonging to Mr. Norris." Pl. 56.1 ¶ 68.

## II.    Procedural Background

Plaintiff filed this action on June 12, 2019. On August 26, 2021, then-presiding Judge Alison J. Nathan referred the case to me for general pretrial supervision. ECF No. 57. On

October 6, 2022, Defendants moved for leave to amend their answer to add counterclaims, and on October 17, 2022, Plaintiff moved for summary judgment. ECF Nos. 111, 117. Judge Engelmayer referred both motions to me, and on March 7, 2023, I denied Defendants' motion for leave to amend. ECF Nos. 115, 121, 138. On April 19, 2023, the Court held oral argument on the parties' cross-motions. See ECF No. 144 ("Tr.").

## DISCUSSION

The Agreement is the genesis of the parties' dispute, and its interpretation is fundamental to resolving their current motions. Thus, it is worth noting at the outset that the Agreement's drafting is profoundly poor. It is replete with typographical errors,[2] internal inconsistencies,[3] erroneous cross-references,[4] inane legalese,[5] unnecessary repetition,[6] absurdly broad language,[7] and seemingly meaningless clauses.[8] It is undisputed that GB Entertainment drafted the

---

[2] E.g., section 1(D)'s reference to the nonexistent section 1(a), which presumably is meant to refer to section 1(A); section 2 contains a second subsection 2(A) in between 2(M) and 2(N); font sizing is inconsistent throughout.

[3] E.g., the term "CREATOR" appears only once, in (the second) section 2(A), and appears to refer to Plaintiff, who is otherwise referred to as "ARTIST"; some capitalized terms (e.g., "WORKS" and "INFORMATION") are expressly defined, while others ("CREATOR" and "NEW WORKS") are not; serial commas are used inconsistently throughout.

[4] E.g., section 1(G) refers to "the final files noted above" but no such files are mentioned above (or below).

[5] E.g., section 2(I) contains the following sentence: "However, if both parties agree to have an agreement to terminate this agreement, both parties have to be in mutual agreement."

[6] E.g., section 2(G) is a non-disclosure provision that is seemingly duplicative of the various confidentiality provisions in sections 4(C)-(G); sections 2(O) and 2(Q) are also seemingly duplicative; sections 5(B) and 5(D) both contain severability clauses; sections 2(K) and 5(D) both require that any modification of the Agreement be made in writing and signed by the parties.

[7] E.g., section 2(D) baldly states that "COMPANY and ARTIST shall share access to all Social Media accounts with administrative privileges and COMPANY shall be the Domain Registrant and Administrator of any domains." Section 4(E) states, with no clear limitation, that "Any posts made public or private by ARTIST must be submitted for approval by COMPANY."

[8] E.g., section 2(B) references "[c]opyright maintained by the ARTIST in the WORKS" despite section 1(A)'s statement that "ARTIST shall retain 0% of the copyright . . . of WORKS[.]" Section 2(H) similarly states that "ARTIST grants the exclusive license to COMPANY in perpetuity of the WORKS." Section 2(O) states that "COMPANY has the right to enforce WORKS . . . ."

Agreement, Pl. 56.1 ¶ 30, but when asked at oral argument, Defendants were unable to answer whether a lawyer had been involved. Tr., 49:11-18.

**I.      Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of establishing that no genuine issue of material fact exists. Id. at 256-57; see Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (citing Celotex, 477 U.S. at 322-23).

To defeat summary judgment, the non-moving party must produce more than a "scintilla of evidence," Anderson, 477 U.S. at 252, and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible . . . ." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); Flores v. United States, 885 F.3d 119, 122 (2d Cir. 2018) ("[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." (quoting Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996))). The non-moving party "must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (internal quotation marks omitted).

In ruling on a motion for summary judgment, the Court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004). When both sides have moved for summary judgment, the district court is "required to assess each motion on its own merits and to view the evidence in the light most favorable to the party opposing the motion, drawing all reasonable inferences in favor of that party." Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd., 661 F.3d 164, 171 (2d Cir. 2011).

## II.    Plaintiff's Claims

The preamble to the Agreement states that it is "with respect to the production of the properties tentatively titled 'Webcomic Name Game' and 'Webcomic Name Stuffed Animals' (the 'WORKS') to be created by [Plaintiff], and any tie-ins, spinoffs, or other commercial development of the WORKS such as Sequels, Prequels, Reboots, Remakes, and Expansions." Plaintiff maintains that the Agreement thus grants Defendants rights to only a narrow portion of their intellectual property relating to the yet-to-be-developed tabletop game, plush toys, and future derivations thereof. Defendants argue that various provisions of the Agreement, read in concert, work to grant them broad intellectual property rights over the Webcomic Name brand. Tr., 14:8-13, 15:18-22[9]; ECF No. 125 at 6.

Both parties allude to extrinsic evidence in support of their respective readings, but the threshold issue of ambiguity was not adequately briefed by either. In any event, at least as it relates to the issues presented here, the Agreement is unambiguous, and therefore extrinsic

---

[9] For example, at oral argument, defense counsel took the position that, if this same agreement instead concerned the creation of a board game starring the fictional character Homer Simpson, its terms would grant Defendants all intellectual property rights in that character, name, and likeness. Tr., 18:6-10.

evidence cannot be considered. See World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.,
345 F.3d 154, 184 (2d. Cir. 2003) ("[A]mbiguity is detected claim by claim. . . . Once a court
finds that a contract is ambiguous, it may look to extrinsic evidence to determine the parties'
intended meaning." (internal quotation marks and citation omitted)).

### A.       Copyright Infringement

Count One alleges copyright infringement in connection with the '369 Application and
the '795 Application, Defendants' pending registration applications for the marks "Webcomic
Name" and "Oh No." Specifically, Plaintiff alleges that Defendants copied their copyrighted
work without authorization when filing their registration applications with the USPTO.
Defendants contend that they acquired these intellectual property rights through the Agreement.

### 1.       Legal Standard

A work is "created" when it is fixed in a copy or phonorecord for the first time;
where a work is prepared over a period of time, the portion of it that has been fixed
at any particular time constitutes the work as of that time, and where the work has
been prepared in different versions, each version constitutes a separate work.

A "derivative work" is a work based upon one or more preexisting works, such as
a translation, musical arrangement, dramatization, fictionalization, motion picture
version, sound recording, art reproduction, abridgment, condensation, or any other
form in which a work may be recast, transformed, or adapted.

17 U.S.C. § 101.

The copyright in a compilation or derivative work extends only to the material
contributed by the author of such work, as distinguished from the preexisting
material employed in the work, and does not imply any exclusive right in the
preexisting material. The copyright in such work is independent of, and does not
affect or enlarge the scope, duration, ownership, or subsistence of, any copyright
protection in the preexisting material.

17 U.S.C. § 103(b).

"Pursuant to the Copyright Act, holders of copyrights in 'United States works' may not
institute a copyright infringement suit 'until preregistration or registration has been made.'"

DigitAlb, Sh.a v. Setplex, LLC, 284 F. Supp. 3d 547, 554 (S.D.N.Y. 2018) (quoting 17 U.S.C. § 411(a)). "On the other hand, non–United States works—generally, works first published outside the United States in a foreign country that is a signatory to the Berne Convention—are exempt from registration." Id. at 555. An unpublished work is a non-United States work if the author is not a national, domiciliary, or habitual resident of the United States. 17 U.S.C. § 101.

"To prevail on a copyright infringement claim, a plaintiff must demonstrate: '(i) ownership of a valid copyright; and (ii) unauthorized copying of the copyrighted work.'" Spin Master Ltd. v. 158, 463 F. Supp. 3d 348, 369 (S.D.N.Y. 2020) (quoting Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003)); see also Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340 (1991). "The word 'copying' is shorthand for the infringing of any of the copyright owner's five exclusive rights described in [17 U.S.C.] § 106." Arista Recs., LLC v. Doe 3, 604 F.3d 110, 117 (2d Cir. 2010) (internal quotation marks and citation omitted). The relevant right enumerated in section 106 is "the exclusive right[] . . . (1) to reproduce the copyrighted work in copies . . . ." 17 U.S.C. § 106.

"Copyright infringement is a strict liability offense in the sense that a plaintiff is not required to prove unlawful intent or culpability, and a user does not have to share copyrighted works in order to infringe a copyright." EMI Christian Music Grp., Inc. v. MP3tunes, LLC, 844 F.3d 79, 89 (2d Cir. 2016) (internal citations omitted).

### 2. Discussion

Because Plaintiff is a British citizen and resident, they are entitled to copyright protection of their work that is either unpublished or was first published outside of the United States.[10]

---

[10] On December 4, 2018, Plaintiff obtained United States copyright registration No. VAu 1-337-956 for "Webcomic Name Collection Volume 1," which included five three-panel comic strips. Id. ¶ 11; see ECF No. 119-3.

Plaintiff argues that they are entitled to summary judgment on Count One because it is undisputed that Defendants submitted screenshots of Plaintiff's Facebook page, Patreon account, and website—all of which included artwork created by Plaintiff—to the USPTO as "specimens of use" in support of the '369 Application and the '795 Application. Pl. 56.1 ¶¶ 48, 52. Defendants argue that they are entitled to summary judgment because the materials submitted were "lawfully licensed" to them under the Agreement, and therefore their copying was not unauthorized.[11] Defendants simultaneously claim that, pursuant to the Agreement, they own the copyright to all the materials they submitted. Tr., 16:11-25, 17:1-7; ECF No. 125 at 7-8. Thus, the issue is whether Defendants were authorized to copy (screenshot) Plaintiff's materials under the terms of the Agreement.

The materials submitted in support of the '369 Application include screenshots of: (1) Plaintiff's Facebook page, @webcomicname, which displays two variations on the Pink Blob as well as a stylized Webcomic Name logo; (2) Plaintiff's Patreon page, including a 3-panel comic featuring the Pink Blob titled "Help Me Patreon," and a banner featuring the Pink Blob along with a stylized Webcomic Name logo; and (3) a "shop" page on Plaintiff's Facebook, which, along with two variations on the Pink Blob in the profile picture and banner, includes images of two t-shirts featuring a yellow cat and a third variation of the Pink Blob. See ECF No. 39-11 at 7-9.

The materials submitted in support of the '795 Application include screenshots of: (1) a product page on Plaintiff's Facebook shop for a t-shirt featuring the Pink Blob and a speech

---

[11] To the Court's frustration, both parties have made a habit of conflating license (where a copyright owner retains their rights while conveying to another party a limited ability to exercise some of those rights), with assignment (where a copyright owner conveys actual ownership of some or all of their rights to another). See LICENSE, Black's Law Dictionary (11th ed. 2019) ("A permission, usually revocable, to commit some act that would otherwise be unlawful."); ASSIGNMENT, Black's Law Dictionary (11th ed. 2019) ("The transfer of rights or property.").

bubble with the phrase "oh no"; (2) the same Facebook shop page mentioned above; (3) a portion of Plaintiff's website, webcomicname.com, displaying a 3-panel comic titled "Invasive" which features the Pink Blob and a purple character, as well as a partial view of another 3-panel comic; and (4) a different portion of Plaintiff's website featuring the same banner as the Patreon page as well as the entirety of the aforementioned partial 3-panel comic, which features the Pink Blob and is titled "New Life." See ECF No. 39-12 at 8-12. Finally, the application contains a photo of a speech-bubble-shaped plush toy upon which the phrase "oh no" is embroidered. See id. at 13.[12]

Defendants argue that Sections 1(A), 1(C), 2(B), 2(C), and 3(C) of the Agreement collectively work to provide them with copyright to all of the materials submitted in support of these two applications. See ECF No. 125 at 7-8. The relevant portions of those sections read as follows:

1. COPYRIGHT ASSIGNMENT

   A. ARTIST shall retain 0% of the copyright . . . of WORKS . . . and COMPANY shall retain 100% . . . . ARTIST assigns to COMPANY their initial rights of the WORKS . . . .

   C. If ARTIST creates a new work with a character or storyline that infringes on any of COMPANY's copyrighted properties, ARTIST agrees to transfer any copyright he may have in that new work to COMPANY.

2. RIGHTS ASSIGNED, CREDITS, AND SERVICES

   B. [T]he Parties shall share . . . the proceeds from . . . the WORKS and the rights, interest, and license therein and with respect thereto, including but not limited to the following: Comic Book Rights, Motion Picture Rights, Animation Rights, Graphic Rights, Sequel Rights, Remake Rights, Television Rights, Gaming Rights, Film Rights, Stage Rights, Radio Rights, Publication Rights, Interactive Rights, Music Rights, Merchandising Rights, and Digital Rights. . . .

   C. COMPANY shall have sole ownership of the original artwork used and created for the WORKS by either ARTIST or by COMPANY. . . .

---

[12] Plaintiff's argument for summary judgment on Count One relates only to the screenshots.

3.  SAMPLES AND COMPLETION OF WORKS AND FUTURE WORKS

> C.  ARTIST shall submit to COMPANY all sequels to the WORKS or other works using characters that appear in the WORKS and any other unrelated characters. COMPANY will take due diligence to copyright all said WORKS with the same percentages and profit splits as discussed above for future works relating to the WORKS above. If COMPANY acquires the NEW WORK, the provisions of this Agreement shall apply to the NEW WORKS.

See Agreement at 1-3.

Section 1(A) is explicitly limited to the WORKS, which the Agreement defines as "the properties tentatively titled 'Webcomic Name Game' and 'Webcomic Name Stuffed Animals' . . . and any tie-ins, spinoffs, or other commercial development of the WORKS such as Sequels, Prequels, Reboots, Remakes, and Expansions." The screenshots at issue are unrelated to the WORKS, as they involve Plaintiff's existing brand and artwork, not the game and plush toys the parties intended to create.

Section 1(C) obligates Plaintiff to transfer to Defendants any potential new work that infringes on any of Defendants' copyrighted properties. This section does not effectuate any assignment of rights from Plaintiff to Defendants. It is also limited to "new work" created by Plaintiff, and it is not alleged that any of the material in the screenshots was created after the Agreement's execution.

Section 2(B) states that the parties will share the proceeds from the WORKS and the rights, interests, and license "therein and with respect thereto." It then lists a non-exhaustive series of rights that this includes, such as "Comic Book Rights." This section is plainly limited to the WORKS and the rights "therein and with respect thereto" and could, for example, cover the

sharing of proceeds and rights to a hypothetical Webcomic Name Game themed comic book.[13]
By its terms it would not cover a more generic Webcomic Name comic book. Thus, as with
Section 1(A), this section has no relation to the screenshots of Plaintiff's existing branding and
artwork.

Section 2(C) grants Defendants ownership of "original artwork used and created for the
WORKS," and while it is not disputed that *some* artwork was created for that purpose, it is not
alleged that any of the copyrighted material in the screenshots fits that description. Defendants
have merely asserted[14] that some of the files delivered to them by Plaintiff "contained several
characters seen in the screenshots," and have failed to explain how this would entitle them to
ownership of the characters themselves as opposed to the specific depictions of the characters
they received. See ECF No. 125 at 11; ECF No. 136 at 8.

Section 3(C)'s first sentence provides that "ARTIST shall submit to COMPANY all
sequels to the WORKS or other works using characters that appear in the WORKS and any other
unrelated characters." This sentence cries out for a comma, because what is to be submitted by
Plaintiff could be read in a number of ways depending on how the sentence is parsed. However,
in any possible reading the verb "submit" does not convey any rights from Plaintiff to
Defendants. It instead contemplates a scenario wherein Plaintiff creates either a sequel to the
WORKS or an entirely different work involving the same characters as the WORKS and requires
them to "submit" that work to Defendants. The section's final sentence confirms the lack of any

---

[13] A twice-derivative product like this may seem esoteric but is not unheard of, see e.g., THE LEGO
BATMAN MOVIE (Warner Bros. Ent. Inc. 2017), and Defendants' argument that a narrow reading of
section 2(B) would render it "meaningless" is without merit.

[14] While Defendants' brief does not cite to record evidence of these files, an exhibit to their supporting
declaration contains an email exchange in which Plaintiff sent Defendants four images, none of which
was submitted in support of the trademark applications. See ECF No. 127-8.

conveyance by providing that *if* the Defendants *were to acquire* such a submitted work, the provisions of the Agreement would also apply to it.

Defendants argue in their opposition brief that "Plaintiff provided artwork for the WORKS which contains at least the characters of the pink blob, orange blob, the cat, and the catchphrase Oh No. These characters became copyright property of Defendants once Plaintiff delivered them." Def. Opp. at 5. But it is unclear how any portion of the Agreement, read in isolation or in context, would work to convey to Defendants Plaintiff's copyright in unrelated preexisting work, much less the characters themselves. Moreover, the WORKS are by their nature "derivative works" as defined in 17 U.S.C. § 101, and section 103(b) makes clear that the copyrights to derivative works are distinct from those in preexisting materials. See Conan Properties Int'l LLC v. Sanchez, No. 17-cv-00162 (FB), 2018 WL 4522099, at *6 (June 8, 2018), adopted, 2018 WL 3869894 (E.D.N.Y. Aug. 15, 2018) (citing section 103(b) for the proposition that a party's "ownership of the derivative works that subsequently portrayed the characters does not establish ownership over the preexisting characters."). Thus, Defendants' argument that they are the rightful owners of the copyright in any character that happened to appear in any materials Plaintiff sent them is unsupported both by the Agreement and by law.[15]

It is undisputed that in submitting the '369 Application and the '795 Application, Defendants copied Plaintiff's copyrighted work. Defendants' arguments in opposition are based not on fact but on a fantastical and incorrect reading of the Agreement. The terms of the Agreement that Defendants rely upon are unambiguous and no reasonable jury could interpret

---

[15] At oral argument, Defendants also could not reconcile their reading of the Agreement with section 1(H), which provides, "ARTIST has the right to pursue his Comic 'Webcomic Name' outside of the context of this agreement." Tr., 47:6-48:23.

them in the way Defendants seek to do. Accordingly, the Court should grant summary judgment

on Count One in favor of Plaintiff.

> **B.**     **False Designation of Origin**

Count Two also relates to the '369 Application and the '795 Application. Plaintiff argues

that Defendants falsely represented in their trademark registration applications that they owned

Plaintiff's copyrighted material.

> **1.**     **Legal Standard**

False designation of origin occurs when:

> (1) Any person who, on or in connection with any goods or services, or any
> container for goods, uses in commerce any . . . false designation of origin . . .
> which—
>
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the
>> affiliation, connection, or association of such person with another person,
>> or as to the origin, sponsorship, or approval of his or her goods, services, or
>> commercial activities by another person . . .

15 U.S.C. § 1125.

"A plaintiff must, as a threshold burden, show use in commerce as an element of [a

trademark] infringement claim." Unicorn Crowdfunding, Inc. v. New St. Enters., Inc., 507 F.

Supp. 3d 547, 563 (S.D.N.Y. 2020) (Engelmayer, J.) (internal quotation marks omitted) (citing

Kelly-Brown v. Winfrey, 717 F.3d 295, 305-06 (2d Cir. 2013)). "[A] complaint fails to state a

claim under the Lanham Act unless it alleges that the defendant has made 'use in commerce' of

the plaintiff's trademark as the term 'use in commerce' is defined in 15 U.S.C. § 1127."

Rescuecom Corp. v. Google Inc., 562 F.3d 123, 127 (2d Cir. 2009).

Section 1127 provides that a mark is used in commerce when "it is placed in any manner

on the goods or their containers or the displays associated therewith or on the tags or labels

affixed thereto, or if the nature of the goods makes such placement impracticable, then on

documents associated with the goods or their sale . . . ." 15 U.S.C. § 1127. "The term 'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." Id.

A "trademark application falls outside the scope of a 'use in commerce' as defined in § 1227. Such an application seeks 'merely to reserve a right in a mark,' and does not involve goods or services sold or rendered in commerce." Unicorn, 507 F. Supp. 3d at 564-65.

### 2.    Discussion

Plaintiff argues that they are entitled to summary judgment on Count Two because it is undisputed that Defendants submitted screenshots of Plaintiff's copyrighted material in support of their applications to the USPTO, and in so doing passed the material off as their own. Defendants argue that they are entitled to summary judgment because the materials submitted were "lawfully licensed"[16] to them under the Agreement and therefore their statements to the USPTO were not false.

Although it is undisputed that Defendants submitted Plaintiff's copyrighted material in their trademark applications, Plaintiff has not demonstrated the threshold requirement of "use in commerce." See Unicorn, 507 F. Supp. 3d at 563, 564-65. At oral argument, Plaintiff was given the opportunity to reconcile their position with Unicorn's explicit holding that a trademark application cannot by itself serve as the basis for a false designation of origin claim. See Tr. 3-10. In response, Plaintiff conceded that Defendants' trademark application did not constitute "use in commerce," id. 10:16-20, but argued that an "exception to that requirement" exists pursuant to United We Stand America, Inc. v. United We Stand, America New York, Inc. See 128 F.3d 86 (2d Cir. 1997) ("United We Stand"). There, the Court of Appeals held that a political

---

[16] See n.11, supra.

16

organization's activities were "services," and that its mark was used "in commerce" within the meaning of § 1114(1)(a) of the Lanham Act. Plaintiff relies on the court's observation that it "appears that 'use in commerce' denotes Congress's authority under the Commerce Clause rather than an intent to limit the Act's application to profitmaking activity." Id. at 92-3.

Here, Plaintiff seeks relief under an entirely different section, 15 U.S.C. § 1125(a)(1), and the Court is not aware of any cases extending United We Stand's language to expand the scope of the Lanham Act.[17] Moreover, "use in commerce" is expressly defined in the Act, 15 U.S.C. § 1127, and it is unclear how that may be reconciled with Plaintiff's implication that the phrase is essentially meaningless. Thus, Plaintiff is not entitled to summary judgment on Count Two as a matter of law.

However, Defendants are also not entitled to summary judgment. Defendants' briefing merely rebuts Plaintiff's arguments and cites to no facts demonstrating that they have *not* used Plaintiff's marks or passed them off as their own in other contexts.[18] While Defendants need not prove a negative to oppose Plaintiff's motion, they must cite to specific facts in the record or an absence of evidence to support an essential element of Plaintiff's claim if they are to prevail on their own. Accordingly, both parties' motions for summary judgment on Count Two should be denied.

---

[17] To the contrary, Unicorn cites to multiple post-United We Stand cases in this Circuit clearly stating that a trademark application alone cannot give rise to a claim under section 1125. See Unicorn, 507 F. Supp. 3d at 564-65 (citing Omega S.A. v. Omega Eng'g, Inc., 396 F. Supp. 2d 166, 174 (D. Conn. 2005) and Macia v. Microsoft Corp., 152 F. Supp. 2d 535, 539 (D. Vt. 2001)).

[18] While Plaintiff's moving papers discuss only the USPTO applications, the Complaint alleges broader misappropriation of their marks, including Defendants' use of "Oh No," a mark which appears nowhere in the text of the Agreement.

### C.  Cancellation of the '281 Mark

Count Three seeks cancellation of the '281 Mark on the ground that the mark has not been used in commerce. Specifically, Plaintiff alleges that the "Webcomic Name" mark has never been used in international class 028, which includes board games and plush toys.

### 1.  Legal Standard

"A petition to cancel a registration of a mark may be filed by any person who believes that he is or will be damaged by the registration of a mark." 15 U.S.C. § 1064 (cleaned up). "In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part . . . and otherwise rectify the register with respect to the registrations of any party to the action." 15 U.S.C. § 1119.

> For a court to grant cancellation of the registration, the petitioning party must demonstrate that it has standing and that valid grounds for cancellation exist. A party seeking cancellation must satisfy two judicially-created requirements: the petitioner must show (1) a "real interest" in the proceeding and (2) a reasonable basis for the belief that the challenged mark has caused or will cause damage. To show a real interest, the petitioner must have a direct and personal stake in the outcome of the cancellation.

Quality Serv. Grp. v. LJMJR Corp., 831 F. Supp. 2d 705, 712 (S.D.N.Y. 2011) (cleaned up). "If a party has standing, it may move for cancellation of a trademark within five years of its issuance on any grounds that would have been valid for the PTO to have denied registration in the first instance." Id. "A [trade]mark qualifies for registration only if its owner uses it in commerce." Gameologist Grp., LLC v. Sci. Games Int'l, Inc., 508 F. App'x 31, 32 (2d Cir. 2013).

A trademark is any "word, name, symbol, or device, or any combination thereof used by a person to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127 (cleaned up). "A [trade]mark is used in commerce when it is employed 'to identify . . . goods or services' sold to consumers 'in a given market.'" Cross Com. Media, Inc. v. Collective, Inc., 841

F.3d 155, 167 (2d Cir. 2016) (quoting ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 147 (2d Cir. 2007)).

2.      Discussion

Defendants currently hold the '281 Mark for "Webcomic Name" in international class 028 ("Board games; Card games; Game cards; Party games; Plush dolls; Plush toys; Stuffed dolls and animals; Stuffed toy animals; Tabletop games; Soft sculpture plush toys; Stuffed and plush toys"). Plaintiff argues that this mark should be cancelled because it has never been used in commerce by Defendants.

Defendants respond on two fronts. First, by claiming that Plaintiff lacks standing to bring this claim because they have not shown they will be damaged by Defendants' registration of the mark "but would rather benefit from it by way of production and sale of products which fall within the Agreement." Def. Br. at 10.

Given the broader context of this case—in which Plaintiff accuses Defendants of using the Agreement as a vehicle for the wholesale misappropriation of Plaintiff's brand—this argument seems disingenuous. Plaintiff has easily cleared the low bar to standing by citing to the undisputed fact that their own application to register the trademark "Webcomic Name" in international class 016 ("Comic books; Comic strips and comic strip's comic features, appearing in print media, namely, comic books, books, newspapers, magazines") was rejected due to Defendants' registration. Plaintiff's principal creation under the Webcomic Name brand is a comic and depriving them of the ability to use their mark in connection with comic books or strips is a serious injury.

Second, although it is undisputed that no units of the WORKS were ever sold, Pl. 56.1 ¶¶ 41-42, Defendants claim that they have nonetheless used the mark Webcomic Name in

commerce. One of the other games Defendants purportedly acquired from Wiseman at the same time as Webcomic Name Game was "Pretending to Grownup." That game included 32 "guest artist cards," one of which was illustrated by Plaintiff and features three variations on the Blob character as well as the phrase "oh no." See ECF No. 127-2. Defendants assert that alongside the illustration on the card is text reading "artwork courtesy of Webcomic Name," and that this constitutes use in commerce by them of the Webcomic Name mark.

As an initial matter, the image cited by Defendants appears in a letter assigning the illustration to Wiseman. See id. Webcomic Name does not appear in the illustration, and Defendants have not cited to the card itself. As such, Defendants have failed to produce more than a "scintilla of evidence" to defeat Plaintiff's motion on this Count, and in fact have produced *no* evidence of their use of the mark in commerce. Anderson, 477 U.S. at 252; see Tr., 59:11-25.

Assuming, *in arguendo*, that Defendants had produced the card and that it did in fact read "artwork courtesy of Webcomic Name," such text would still not constitute use of a mark in commerce that would validate Defendants' registration of the mark. This is because Defendants' alleged use of the Webcomic Name merely identified the illustration's origin and did not distinguish the goods being sold—the game Pretending to Grownup—from those sold by others. See 15 U.S.C. § 1127. Put another way, Defendants may have used the words Webcomic Name, but they did not make use of the *mark*.[19]

---

[19] This distinction is supported by the concepts of fair use and nominative use—two common defenses to trademark infringement. "Classic fair use is use of a mark not in a trademark sense, but in a descriptive sense, and in good faith." Merck & Co. v. Mediplan Health Consulting, Inc., 425 F. Supp. 2d 402, 412 (S.D.N.Y. 2006). "Fair use permits others to use a protected mark to describe aspects of their own goods." Id. (quoting Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc., 166 F.3d 65, 73 (2d Cir. 1999)). "Nominative use is a use of another's trademark to identify, not the defendant's goods or services, but the plaintiff's goods or services. It is called nominative use because it names the real owner of the mark."

Although not explicitly raised by Plaintiff, a more fundamental issue is presented by Defendants' registration of the Webcomic Name mark. As discussed *supra*, the Agreement is limited to the WORKS and derivative products. Section 1(A) states that Defendants shall retain "100% of the trademark . . . of WORKS" which is defined as, a "propert[y] tentatively entitled 'Webcomic Name Game' and 'Webcomic Name Stuffed Animals."

The Agreement's definition of the WORKS could ostensibly entitle Defendants to registration of "Webcomic Name *Game*" in certain categories, but it does not convey ownership of the more general "Webcomic Name" mark in any category except stuffed animals. Accordingly, Defendants are not the rightful owners of the Webcomic Name mark in many of the categories in which they obtained and have sought registration.

Plaintiff has cited to undisputed facts establishing that Defendants have never used the Webcomic Name mark in commerce. Defendants are also not the owners of the Webcomic Name mark in any category beyond stuffed animals, and thus were not entitled to registration in other categories. Accordingly, Plaintiff is entitled to summary judgment on Count Three, and the Court should order cancellation of the '281 Mark.

### D. Breach of Contract and Declaratory Judgment

Count Four is for breach of contract. Plaintiff argues that Defendants breached the Agreement by (1) refusing to pay Plaintiff the advance mentioned in section 1(G) upon delivery of "the final files," and (2) by exceeding the scope of the license granted to them under the Agreement. In Count Five, Plaintiff also seeks declaratory judgment that they validly terminated the Agreement.

---

Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC, 823 F.3d 153, 165 (2d Cir. 2016) (internal quotation marks and citation omitted).

As to the first alleged breach, the parties dispute both the meaning of the word "final"—which is not defined in the Agreement—and whether the files were delivered at all.[20] See Pl. 56.1 ¶¶ 34-35; D. 56.1 ¶ 23. Given that delivery of the files was a condition precedent to payment of the advance under the Agreement,[21] a dispute of material fact exists that precludes summary judgment.

Plaintiff also argues that Defendants' attempts to trademark both "Webcomic Name" and "Oh No" were an "excessive use of the Collaboration Agreement, well beyond its scope" that constitutes material breach.

Defendants respond that their actions were within the scope of the Agreement—specifically section 2(B). This argument presumes the same flawed reading of that section addressed by the Court in the copyright infringement context and is likewise meritless here.

Plaintiff correctly notes that "Defendants do not claim that excessive overreach is not a legal basis to cancel a license such as the Collaboration Agreement, but rather, Defendants merely argue that they did not overreach." However, the cases cited in support of the idea that Defendants' applications to the USPTO constitute material breach of the Agreement all deal with licenses, rather than assignments. The Agreement does not grant Defendants a license to use Plaintiff's property, but instead assigned certain rights to Defendants.[22] While the parties use these terms interchangeably, the distinction between them is significant, and Plaintiff has

---

[20] It has also been suggested that Plaintiff uploaded the files to a hosting service but deleted them before Defendants were able to access them. Tr., 45:1-2, 6-14.

[21] The relevant portion of section 1(G) reads: "The ARTIST will receive a $3,125 upfront advance against net sales royalties within 30 days of the COMPANY receiving the final files noted above for 'Webcomic Name Game' for a game developed with Jason Wiseman and the ARTIST known as Alex Norris of Webcomic Name tentatively titled 'Webcomic Name Game' by the COMPANY."

[22] Section 2(H) purports to grant "the exclusive license to [Defendants] in perpetuity of the WORKS." However, because section 1(A) already granted Defendants "100% of the copyright, 100% of the trademark, [and] 100% of the patent" in the WORKS, it is unclear what further effect 2(H) could possibly have.

22

provided no authority stating that the misappropriation of a contractual counterpart's trademark can constitute a breach of the parties' contract.

A license is inherently limited in scope. Those limitations are implicitly contemplated in any agreement that grants one, and exceeding those limitations is therefore a breach of the agreement.[23] In contrast, an assignment may stand alone, and infringement on un-assigned marks is unrelated to the contract containing the assignment. Consider the following examples:

If A grants B a license to use A's trademark in country X, but B then also uses the mark—without further authorization—in country Y, B may be liable for trademark infringement *and* breach of contract for exceeding the scope of their license.[24]

In contrast, if A owns trademarks A1 and A2, and assigns A1 to B in a written agreement that makes no mention of A2, B's subsequent infringement of the A2 mark is entirely unrelated to the conveyance of the A1 mark, and therefore would not constitute a breach of that contract.

Had Defendants trespassed on an entirely unrelated property right of Plaintiff's, e.g., by copying a comic from a series other than Webcomic Name, that would certainly not constitute a breach of the Agreement. And while Defendants' infringing actions are in proximity to the Agreement and its limited assignment of rights, the Court is unable to discern a principled distinction that would qualify this infringement, but not other forms of trespass, as a breach of contract. Accordingly, Plaintiff is not entitled to summary judgment on Count Four.

---

[23] This is the proposition that Plaintiff's cited cases support. See e.g., Bowmar Instrument Corp. v. Cont'l Microsystems, Inc., 497 F. Supp. 947, 959 (S.D.N.Y. 1980); Muze, Inc. v. Digital On-Demand, Inc., 123 F. Supp. 2d 118, 129 (S.D.N.Y. 2000). See also, Murjani Int'l, Ltd. v. Sun Apparel, Inc., No. 87-cv-04628 (PKL), 1987 WL 15110, at *10 (S.D.N.Y. July 31, 1987) (citing 15 U.S.C. § 1114(1)) ("The continued use . . . of a licensed trademark after the licensing agreement ha[s] been terminated constitutes . . . trademark infringement as well as a breach of contract.").

[24] See generally, Omri Ben-Shahar, Damages for Unlicensed Use, 78 U. CHI. L. REV. 7, 9 (2011) (discussing the overlap between breach of contract and infringement where a licensee infringes on a licensor's intellectual property).

Defendants conclude their cross-motion by claiming that because "because all actions taken by Defendants fall within the scope of the Agreement, Plaintiff has failed to sufficiently show a cause of action for Breach of Contract," and that therefore "Defendants are entitled to summary judgment as a matter of law, as well as a declaratory judgment that Plaintiff's termination of the contract was invalid." ECF No. 125 at 19.

Defendants, in moving against the party who will carry the ultimate burden of proof at trial, have technically satisfied their burden on breach of contract, but the legal basis on which the Court recommends denying Plaintiff's motion—the license/assignment distinction—was not briefed by either party. Also, in seeking declaratory judgment, Defendants seem to confuse the standards for defeating a summary judgment motion and prevailing on one; they merely rebut Plaintiff's arguments and make no attempt to cite to undisputed facts demonstrating that Plaintiff's termination was without basis. See also Def. 56.1. This is particularly concerning because Defendants' actions thus far, which they attempt to justify with a plainly erroneous reading of the Agreement, call in to question their good faith, leaving open the possibility that Plaintiff's termination was valid. Therefore, I recommend that both parties' motions as they pertain to breach of contract and declaratory judgment be denied.

## CONCLUSION

I recommend that Plaintiff's motion for summary judgment be GRANTED in part, and Defendants' cross-motion for summary judgment be DENIED.

SARAH NETBURN
United States Magistrate Judge

DATED:      May 22, 2023
             New York, New York

\*   \*   \*

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS
TO THIS REPORT AND RECOMMENDATION**

   The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Engelmayer at the United States Courthouse, 40 Foley Square, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Engelmayer. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALEXANDER NORRIS,

                                        Plaintiff,                        19 Civ. 5491 (PAE) (SN)

                        -v-
                                                                          OPINION & ORDER

MARC GOLDNER, *et al.*,

                                        Defendants.

PAUL A. ENGELMAYER, District Judge:

        This copyright and trademark action arises out of the breakdown of a business

relationship between plaintiff Alexander Norris, a visual artist behind a popular webcomic series,

and defendants Marc Goldner and his companies, which manufacture toys, games, and books.

Norris's best-known character is "Blob."  In each comic strip, Blob suffers one of life's banal

misfortunes and exclaims its catchphrase, "Oh no."  A representative example appears below:



Dkt. 119, Ex. 3 at 4.

        The dispute between Norris and Goldner centers on their contract.  In Norris's view, their

contract is of only limited scope, giving Goldner copyright rights with respect only to a planned

Blob-themed boardgame and stuffed animal.  In Goldner's view, the contract is far broader,

conveying rights not just to the planned boardgame and its derivatives, but also to all of Norris's

work featuring Blob.  In this action, Norris brings a range of claims against Goldner and his

companies, arising from Goldner's (1) registering trademarks derived from Norris's webcomics and (2) failing to pay Norris under their contract. Whether those claims are viable turns in large part on how the contract is read.

Pending now are cross-motions for summary judgment. In a thorough and perceptive Report and Recommendation (the "Report"), the Hon. Sarah Netburn, United States Magistrate Judge, adopted the narrower construction of the parties' contract urged by Norris. Her Report recommends granting Norris's motion in part and denying defendants' motion in full. The Court agrees with Judge Netburn's interpretation of the contract and adopts the Report in substantial part. The Court enters summary judgment for Norris as to the copyright and trademark-cancellation claims. However, as to Norris's trademark-infringement claim, because the evidence cannot establish that defendants ever "use[d]" the relevant mark "in commerce," 15 U.S.C. § 1125, the Court departs from the Report, and enters partial summary judgment for defendants.

I.      **Background**[1]

    A.      **Facts**

        1.      **The Parties and Their Agreements**

---

[1] The facts which form the basis of this decision are taken from the parties' submissions on the instant motions—specifically, Norris's Local Rule 56.1 statement, Dkt. 118 ("Pl. 56.1"), and counterstatement, Dkt. 132 ("Pl. Counter 56.1"); Norris's declaration (and accompanying exhibits), Dkt. 119 ("Norris Decl."), whose attachments include the parties' contract, Dkt. 119, Ex. 5 ("Collaboration Agreement"), and the transcript of Goldner's deposition, Dkt. 120, Ex. 2 ("Goldner Dep. Tr."); Goldner's Local Rule 56.1 statement, Dkt. 126 ("Def. 56.1"), and counterstatement, Dkt. 129 ("Def. Counter 56.1"); and Goldner's declarations (and accompanying exhibits), Dkt. 127 ("Goldner Decl."), including the partial transcript of Norris's deposition, Dkt. 128, Ex. 1 ("Norris Dep. Tr.").

In 2015, Norris first used Blob in a webcomic.  Pl. 56.1 ¶¶ 1–3; *see also* Norris Decl. ¶ 5; Norris Decl., Ex. 1 at 1 (screenshots of Blob's first comics).[2]  Blob, in Norris's words, "tap[s] into the current internet zeitgeist of self-conscious pessimism to hilarious and heartbreaking effect."  Norris Decl. ¶ 4.  In 2016, buoyed by Blob's success, Norris launched "Webcomic Name," a weekly comic strip based on Blob, and acquired the associated domain, webcomicname.com.  Pl. 56.1 ¶¶ 6–8; *see also* Norris Decl. ¶ 6.  That same year, Norris set up an online shop, "The 'Oh No' Shop," which sold merchandise that featured Blob and its catchphrase, "Oh no."  Pl. 56.1 ¶ 9; *see also* Norris Decl., Ex. 1 at 2–4.  Although "Webcomic Name" began as the name of just a comic strip, it soon became Norris's overarching brand for "illustrations, literary works, and workshops."  Pl. 56.1 ¶ 8; *see also* Norris Decl. ¶¶ 6–7.

Enter boardgame designer Jason Wiseman.  By early 2017, Wiseman and Norris had embarked upon two collaborations.  The first related to Wiseman's tabletop card game, "Pretending to Grownup," which had, in late 2016, received 6,000 orders on a crowdfunding platform and was about to enter its first printing.  *See* Goldner Dep. Tr. at 17–19.  The game featured a "bonus card," illustrated by Norris, that depicted Blob and its catchphrase.  *See* Goldner Decl. ¶ 2.  In a separate agreement, Norris "g[a]ve . . . full ownership of the single guest illustration" to Wiseman and "any successors or assigns . . . for any future use."  *Id.*, Ex. 2 at 2

---

[2] Unless otherwise stated, the facts in paragraphs cited from Norris's and Goldman's Rule 56.1 statements were unopposed by the adversary.  Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and are denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

("Norris and Wiseman Agreement").  The second collaboration related to a proposed tabletop

card game that would "incorporate the style, concept, and characters of 'Webcomic Name.'"

Norris Decl. ¶ 12; *see also* Pl. 56.1 ¶ 12.  Wiseman told Norris he was considering an external

boardgame publisher, Marc Goldner, to publish and distribute that game.  Norris Decl. ¶¶ 9–10;

*see also* Pl. 56.1 ¶ 14.

On February 6, 2017, Wiseman emailed Goldner, with whom he had worked in the past,

to discuss, among other things, Pretending to Grownup and the as-yet-untitled Webcomic Name

card game.  *See* Goldner Dep. Tr. at 17–18; Goldner Decl., Ex. 1 at 2.  Goldner and his

companies, Golden Bell Entertainment, LLC ("GB Entertainment") and Golden Bell Studios,

LLC ("GB Studios"), work with "writers, artists, designers, and other creators" to publish and

distribute toys, games, and books.  Def. Br. at 2.  In the email, Wiseman told Goldner that he had

"100% free reign [sic]" over both properties and proposed that Wiseman and Goldner work

together "to reduce [Wiseman's] workload."  Goldner Decl., Ex. 1 at 2; *see also* Goldner Dep.

Tr. at 19–22.

From there, things moved quickly.  That same week, on February 12, GB Entertainment

entered into a contract with Wiseman.  In it, GB Entertainment agreed to publish, print, and

market several of Wiseman's board games, including "the properties tentatively entitled

'Pretending to Grownup' . . . and 'Webcomic Name Game.'"  Dkt. 131, Ex. 1 at 1 ("Wiseman

and GB Entertainment Agreement").  In exchange, Wiseman agreed to transfer "100% of the

copyright and 100% of the trademark" of both works to GB Entertainment, to split the profits of

future sales, and to have the same terms apply to "[a]ll future derivative works."  *Id.* at 1–3.

Norris was not a party to this contract; instead, Wiseman and Norris appear to have had a

separate, informal agreement to split the proceeds of Webcomic Name Game. *See* Goldner Decl., Ex. 3 at 2.

A few months later, Goldner decided that he should have a direct relationship with Norris, rather than only working with Norris through Wiseman. *See* Goldner Dep. Tr. 38. On June 26, Goldner emailed Norris to introduce himself, and suggested that Norris sign a contract with GB Entertainment "so its [sic] all official and you're getting half the payment as promised and complimentary games." Goldner Decl., Ex. 3 at 2. In the same email, Goldner expressed his enthusiasm for the "derivative merchandise" that would accompany the Webcomic Name Game, including "the cutest Stuffed Plush ever," and noted that the "potential[] for a stand alone comic, a children's book, or something else." *Id.*

On July 1, Goldner sent Norris a proposed contract. *See* Goldner Decl., Ex. 4 at 3. A few days later, on July 3, Norris replied, expressing concerns. *See id.* at 1. Norris wrote: "I will be working with publishers on a book . . . . I want to make it clear that in no way does Golden Bell take ownership of any of the characters, images or story content except in its application in a tabletop game." *Id.* On July 11, to reassure Norris, Goldner sent an edited draft of the contract that "specified its [sic] for game and stuffed animal." *Id.* Goldner explained that Wiseman "had agreed to us purchasing the rights for the [Webcomic Name] game already and that part of the deal was already done." *Id.* "You are obviously in the free and clear," Goldner wrote, "to work on your property outside of the context of our contract." *Id.*

On August 10, Goldner and Norris executed the amended contract. Pl. 56.1 ¶ 27; Def. 56.1 ¶ 5. By its terms, the agreement was "with respect to the production of the properties tentatively entitled 'Webcomic Name Game' and 'Webcomic Name Stuffed Animals' (the 'WORKS') . . . and any tie-ins, spinoffs, or other commercial development of the WORKS such

as Sequels, Prequels, Reboots, Remakes, and Expansions." Collaboration Agreement at 2. In

short, GB Entertainment was to receive "100% of the copyright, 100% of the trademark, . . . and

95% of the net sales of [the] WORKS," and Norris was to receive a "$3,125 upfront advance

against net sales royalties within 30 days of [GB Entertainment] receiving the final files . . . for

'Webcomic Name Game'" and "an additional $2,500 . . . upon delivery to [GB Entertainment] of

the final print-ready files, the PSD files, the AI files, the InDesign Files, and any other files

pertaining to the [Webcomic Name Game]." *Id.* Other clauses governed future works. *See id.* at

4.

Two months later, on October 31, Norris entered into an agreement with Andrews

McMeel Universal, a book publisher, to publish a book of Norris's Blob-themed comic strips.

*See* Goldner Decl., Ex. 14 at 2.

### 2.    The Parties' Competing Trademark Applications

After their contract was signed, GB Entertainment filed several trademark applications

related to Norris's illustrations and their proposed Blob-themed game. First, on November 30,

2017, GB Entertainment filed an application to register "Webcomic Name" as a trademark in

International Class ("IC") 28 for "Board games; Card games; Game cards; Party games; Plush

dolls; Plush toys; Stuffed dolls and animals; Stuffed toy animals; Tabletop games; Soft sculpture

plush toys; Stuffed and plush toys."[3]  Norris Decl., Ex. 7 (the "First Application") at 1–2. The

---

[3] To register a trademark, an applicant must specify "the goods in connection with which the
mark is used." 15 U.S.C. § 1051(a)(2). Under the Nice Convention, ratified by the United States
in 1957, all goods are classified, for trademark purposes, within categories known as
international classes. *See* 23 U.S.T. 1336, 550 U.N.T.S. 45 (as last revised at Geneva on Oct. 2,
1979). IC 28, for instance, covers "[g]ames, toys and playthings." 37 C.F.R. § 6.1. In some
cases, a business might use one mark to identify goods in two or more categories. Unilever's
single trademark, for instance, covers both its "liquid soaps," which fall within IC 3, and its
"[c]offee, tea, and tea substitutes," which fall within IC 30. *See* UNILEVER, Registration No.

U.S. Patent and Trademark Office ("USPTO") approved GB Entertainment's application as Registration No. 5,629,281 (the "'281 Mark").  *See* Norris Decl., Ex. 8 at 1.

Second, on October 9, 2018, GB Entertainment filed an application to register "Webcomic Name" as a trademark in IC 16 for "Comic books; Comic strips; Comic strips' comic features; Comics; Newspaper comic strips," and in IC 25 for "T-shirts."  Norris Decl., Ex. 9 (the "Second Application") at 1–2.  As part of this application, Goldner filed specimens to show his use of the mark in commerce, including screenshots of Norris's social-media platforms that include cartoons of Blob.  *See id.* at 7–9.  This application has since been abandoned.[4]

Third, on November 8, 2018, GB Entertainment filed an application to register "Oh No" as a trademark in IC 16 for "Bookmarkers; Bookmarks; Comic books; Comic magazines; Comic strips; Comic strips' comic features; Comics; Stickers; Newspaper comic strips," in IC 25 for "T-shirts; Graphic T-shirts; Short-sleeved or long-sleeved t-shirts," and in IC 28 for "Plush toys; Stuffed toy animals; Stuffed and plush toys; Toy stuffed animals."  Norris Decl., Ex. 10 (the "Third Application") at 1–2.  Like the Second Application, this application included screenshots

---

6,200,651.  An applicant who wishes to use a mark in multiple categories may register either one multi-class trademark (as Unilever chose to do), which covers all specified uses, or separate single-class applications.  *See* 37 C.F.R. §§ 2.86–.87.

[4] *See* Notice of Abandonment, USPTO (Jan. 4, 2021, 6:10 PM), *available at* https://tsdr.uspto.gov/documentviewer?caseId=sn88147369&docId=NOA20210104205425&linkId=1#docIndex=0&page=1.  This fact did not appear in either party's brief.  But a court may take judicial notice of any fact "that is not subject to reasonable dispute because . . . it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2), (d).  Government records are such sources.  *See, e.g.*, *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015).

of Norris's social-media platforms, as well as a speech-bubble plush toy embroidered with the

phrase "oh no."  *See id.* at 8–13.  This application, too, has since been abandoned.[5]

At some point in 2018, Norris learned of GB Entertainment's trademark applications.[6]

On December 4, 2018, Norris filed a competing application to register "Webcomic Name" as a

trademark in IC 16 for "Comic books; Comic strips and comic strip's [sic] comic features,

appearing in print media, namely, comic books, books, newspapers, magazines," and in IC 41 for

"Providing online non-downloadable webcomics and comic strips, books, reviews, periodicals

and magazines."  Norris Decl., Ex. 11 at 1–2.  That same day, Norris also filed a copyright

application for several sample Webcomic Name comics.  Norris Decl., Ex. 3 at 1–2.  Norris's

trademark application was refused because of the likelihood of confusion with GB

Entertainment's earlier registered '281 Mark, *see* Norris Decl., Ex. 12 at 4, but Norris's

copyright application was approved, *see* Norris Decl., Ex. 3 at 1.

### 3.    Development of the Webcomic Name Game

Once the contract was signed in 2017, progress slowed on the development of the

Webcomic Name Game.  Norris attests to "f[alling] off the face of the earth a while" and having

little contact with Goldner until November 2017.  Goldner Decl., Ex. 8 at 2; *see also* Goldner

Decl., Ex. 9 at 2.

On November 29, 2017, Norris sent to Goldner four concept sketches of potential plush

toys, *see* Goldner Decl., Ex. 8 at 2, and on December 11, 2017, Norris pledged to begin work on

---

[5] *See* Notice of Abandonment, USPTO (Feb. 1, 2021, 6:11 PM), *available at* https://tsdr.uspto.gov/documentviewer?caseId=sn88185795&docId=NOA20210201205408&linkId=1#docIndex=0&page=1.

[6] The precise date is disputed.  Norris claims Goldner only mentioned the applications in November 2018, *see* Pl. 56.1 ¶ 54, whereas Goldner claims he discussed at least one of the applications with Norris several months earlier, in February 2018, *see* Def. Counter 56.1 ¶ 54.

the Webcomic Name Game once the book was finalized in March 2018, *see* Goldner Decl., Ex. 9

at 2.  Over the next several months, there was more back-and-forth between Norris, Goldner, and

Wiseman, including a discussion of proposed boardgame mechanics and designs.  *See* Goldner

Decl., Ex. 10 at 2; Goldner Decl., Ex. 11 at 2.

      In late 2018, the parties' relationship became more fraught.  On October 1, 2018, Norris

sent Goldner invoices for "both parts of the advance."  Goldner Decl., Ex. 12 at 4; *see also* Def.

56.1 ¶ 22; Collaboration Agreement at 2 (promising $3,125 upon receipt of "final files" and

$2,500 upon receipt of "print-ready files").  Norris told Goldner: "Not all of the print-ready files

have been delivered yet . . . .  I will upload the rest as soon as this first payment has gone through

. . . ."  Goldner Decl., Ex. 12 at 4.  That same day, Goldner responded, explaining that GB

Entertainment "MUST receive the final files before paying as required in the contract," and

asking Norris to "[p]lease upload the files today."  *Id.*

      The parties dispute whether Norris ever sent the "final files" for Webcomic Name Game.

Norris attests to having delivered the final files via an online file-sharing service on October 2,

2018.  Pl. 56.1 ¶ 34; *see also* Norris Decl. ¶ 19; Norris Decl., Ex. 6 at 1.  Goldner retorts that

Norris never provided the final files; instead, he states, the shared folder that had been used by

Norris to deliver files to GB Entertainment "did not contain any such files."  Goldner Decl. ¶ 23.

Norris was never paid either advance.  *See* Pl. 56.1 ¶ 35.

      **4.**      **Earlier Proceedings and Termination of the Agreement**

On March 25, 2019, Norris filed a petition with the Trademark Trial and Appeal Board
("TTAB"), an administrative tribunal within the USPTO, *see* 15 U.S.C. § 1067, to cancel GB
Entertainment's '281 Mark.  *See* Norris Decl., Ex. 13 at 1.[7]

In the days after that filing, Goldner's counsel wrote Norris's publisher, demanding that it
"immediately and permanently cease all use of or reference to" the '281 Mark, *see* Norris Decl.,
Ex. 17 at 1–2, and Norris's counsel, claiming that GB Entertainment "is the exclusive owner of
the copyrights to Webcomic and 'Oh No'" and that Norris's "engagement with Andrews
McMeel" constitutes a "breach" of the Collaboration Agreement, *see* Norris Decl., Ex. 18 at 1–2.
A week later, on April 1, Norris's counsel responded, expressing "bewilder[ment]" at GB
Entertainment's suggestion that "'Oh No' [was] part of the Works . . . subject to the Agreement."
Norris Decl., Ex. 20 at 1.  Norris's counsel concluded that Norris had no choice but to terminate
the contract given GB Entertainment's "improper[] attempt[] to use the Collaboration Agreement
as a vehicle to misappropriate [Norris's] intellectual property."  *Id.*

### B.    Procedural History

On June 12, 2019, Norris commenced this action, naming Goldner, GB Entertainment,
and GB Studios as defendants, and bringing claims of copyright infringement, false designation
of origin, and breach of contract, seeking damages, cancellation of the '281 Mark, and a
declaratory judgment.  *See* Dkt. 1.  A year later, on July 13, 2020, the Hon. Alison J. Nathan, to
whom this matter was then assigned, granted Norris's motion to file a supplemental complaint.
*See* Dkt. 37.  Norris did so on August 8, 2020, bringing the same claims.  *See* Dkt. 39.  On April
10, 2022, this case was reassigned to this Court.

---

[7] Norris's TTAB proceeding has been stayed pending the outcome of this action.  *See* Pl. 56.1
¶ 57; *see also* Notice of Suspension, *Norris v. Golden Bell Ent., LLC*, Cancellation No.
92,070,899 (T.T.A.B. Sept. 26, 2022).

On October 17, 2022, Norris moved for summary judgment, *see* Dkt. 117, and on

September 16, 2022, defendants cross-moved for the same, *see* Dkt. 124.  The Court referred

both motions to Judge Netburn, who had been responsible for the general pretrial supervision of

the case, for a Report and Recommendation.  *See* Dkt. 121, 135.  On April 19, 2023, Judge

Netburn held argument.  *See* Dkt. 144 ("Tr. of Oral Arg.").

On May 22, 2023, Judge Netburn issued the Report.  Dkt. 146 ("Report").  As more fully

developed below, the Report recommends granting Norris's motion in part and denying

defendants' motion in full.  *Id.* at 1.  On June 6, 2023, defendants filed objections.  Dkt. 148

("Obj.").  On June 20, 2023, Norris filed a reply.  Dkt. 149 ("Pl. Reply to Obj.").

## II.    Legal Standards

### A.    Reports and Recommendations

After a magistrate judge has issued a Report and Recommendation, a district court may

"accept, reject, or modify, in whole or in part, the findings or recommendations made by the

magistrate judge."  28 U.S.C. § 636(b)(1).  To accept the portions of a report to which no timely

objection has been made, "a district court need only satisfy itself that there is no clear error on

the face of the record."  *Acevedo v. Lempke*, No. 10 Civ. 5285 (PAE) (HBP), 2014 WL 4651904,

at *3 (S.D.N.Y. Sept. 17, 2014) (quoting *King v. Greiner*, No. 2 Civ. 5810 (DLC), 2009 WL

2001439, at *4 (S.D.N.Y. July 8, 2009)).  When a timely and specific objection has been made,

the court is obligated to review the contested issues *de novo*.  *See* Fed. R. Civ. P. 72(b)(3); *Hynes

v. Squillace*, 143 F.3d 653, 656 (2d Cir. 1998).  "Courts generally do not consider new evidence

raised in objections to a magistrate judge's report and recommendation."  *Tavares v. City of New

York*, No. 08 Civ. 3782 (PAE), 2011 WL 5877548, at *2 (S.D.N.Y. Nov. 23, 2011); *see also Pan

Am. World Airways v. Int'l Bhd. of Teamsters*, 894 F.2d 36, 40 n.3 (2d Cir. 1990) ("A district

judge is not required to hear or rehear any witness, and Pan Am had no right to present further testimony when it offered no justification for not offering the testimony at the hearing before the magistrate.").[8]

### B.    Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show . . . that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[8] Norris argues that the Court should review several of defendants' objections only for clear error, because the arguments made in support are "identical" to arguments before Judge Netburn.  *See* Pl. Reply to Obj. at 7–11.  If a party's objections are "merely perfunctory" or conclusory, clear-error review is appropriate, *Edwards v. Fischer*, 414 F. Supp. 2d 342, 346–47 (S.D.N.Y. 2006), given Federal Rule of Civil Procedure 72(b)(1)'s requirement that a party file "specific written objections" to a report and recommendation.  Fed. R. Civ. P. 72(b)(2).  But that does not preclude a party from renewing, in a developed manner, arguments made and rejected before the magistrate judge.  Indeed, "the only way for [a defendant] to raise arguments" before the district court may be "to reiterate" arguments previously made.  *Moss v. Colvin*, 845 F.3d 516, 520 n.2 (2d Cir. 2017) (per curiam) (cleaned up); *see also, e.g.*, *Miller v. Brightstar Asia, Ltd.*, 43 F.4th 112, 121 (2d Cir. 2022) ("To the extent that the objection sought to revisit an issue already argued, it was only because, in [the objecting party's] view, the magistrate judge's specific error was a fundamental one.").

Here, defendants have developed their arguments before this Court with sufficient specificity, such that the "portions of the report" to which defendants specifically object—even if in a matter reprising arguments made below—are subject to "*de novo* determination."  28 U.S.C. § 636(b)(1)(C).  Norris's notion that a party that develops before the district judge an argument that had been made before the magistrate judge must establish clear error at the second stage would all but eliminate *de novo* review of reports, given that new legal theories "cannot properly be raised for the first time in objections to the report and recommendation, and indeed may not be deemed objections at all."  *Piligian v. Icahn Sch. of Med. at Mount Sinai*, 490 F. Supp. 3d 707, 716 (S.D.N.Y. 2020) (citation omitted); *see Watson v. Geithner*, No. 11 Civ. 9527 (AJN) (HBP), 2013 WL 5441748, at *2 (S.D.N.Y. Sept. 27, 2013) (noting predicament created by requiring new arguments upon review of a report while forbidding arguments that are *so* new as to be deemed waived).

When the movant has properly supported its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

### III.   Discussion

Norris and defendants each moved for summary judgment on all five counts. The Report recommends granting summary judgment to Norris (and therefore denying defendants' motion) as to two counts: Count One, alleging copyright infringement in connection with defendants' trademark applications, and Count Three, seeking cancellation of the '281 Mark. The Report otherwise recommends denying both sides' summary judgment motions as to the remaining three counts: Count Two, alleging false designation of origin; Count Four, seeking damages for breach of contract; and Count Five, seeking a declaratory judgment that Norris validly terminated the Agreement.

13

Only defendants filed objections to the Report.  *See* Dkt. 148 ("Obj.").  They object to the

Report's recommendation on all counts except Count Five.

As to the portion of the Report addressing Count Five, the Court reviews it for clear error.

*See Encarnacion-Cross v. McAuliffe*, No. 17 Civ. 3603 (PAE) (GWG), 2018 WL 3384438, at *1

(S.D.N.Y. July 11, 2018).  Finding none, the Court adopts Judge Netburn's recommendation as

to that Count in full.

### A.     Copyright Infringement

Defendants object on three grounds to the Report's recommendation that the Court grant

summary judgment to Norris on the copyright-infringement claim.  The Court first reviews the

governing legal standards and then addresses these arguments in turn.

### 1.     Applicable Legal Standards

To establish copyright infringement, "two elements must be proven: (1) ownership of a

valid copyright, and (2) copying of constituent elements of the work that are original."  *Feist*

*Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *see also Matthew Bender & Co.*

*v. W. Pub. Co.*, 158 F.3d 674, 679 (2d Cir. 1998).  As to the first element, once an "original

work[] of authorship" is "fixed in any tangible medium of expression," 17 U.S.C. § 102(a), a

copyright "vests initially in the author . . . of the work," *id.* § 201(a).  Registration is, in some

cases, required to maintain suit for infringement; it is not required, however, to possess a

copyright in the first place.[9]  *See* 17 U.S.C. § 408(a) (noting that "registration is not a condition

of copyright protection").

---

[9] Under 17 U.S.C. § 411(a), registration is a prerequisite to suit "for infringement of the
copyright in any United States work."  Non–U.S. citizens' unpublished works are exempt from
registration, 17 U.S.C. §§ 101, 411(a), as are works "first published outside the United States,"
*DigitAlb, Sh.a v. Setplex, LLC*, 284 F. Supp. 3d 547, 554 (S.D.N.Y. 2018).  The Report appears

As to the second element, a "plaintiff must show both that his work was 'actually copied' and that the portion copied amounts to an 'improper or unlawful appropriation.'" *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) (quoting *Castle Rock Ent. Inc. v. Carol*

_____

to have concluded the works at issue fall into one of these two categories. *See* Report at 9 (describing this regime and noting Norris's foreign citizenship and residence).

In a brief footnote, defendants assert that there is "no apparent authority indicating that works first published on the internet constitute foreign works"; they thus suggest, for the first time, that Norris must "register[] prior to initiating a cause of action for copyright infringement." Obj. at 7 n.1. That argument fails for two reasons. First, it is waived. In litigating summary judgment before Judge Netburn, defendants did not argue Norris's action failed for lack of registration. *See* Def. Br. at 7–9 (arguing only that Norris's "copyright was validly assigned to [d]efendants"); Dkt. 136 ("Def. Reply Br.") at 4–6 (same). There was no impediment to so arguing then. *See United States v. Gladden*, 394 F. Supp. 3d 465, 480 (S.D.N.Y. 2019). And because § 411(a) is not jurisdictional, this Court does not have an independent obligation to consider its application here. *See Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 157 (2010) (§ 411(a) "does not restrict a federal court's subject-matter jurisdiction").

Second, on the merits, defendants' argument fails, as both of § 411(a)'s exceptions appear to apply. As to the first, the record makes highly doubtful that the works at issue—Norris's social-media pages—are "published" at all. *Cf.* Melville B. Nimmer, *Copyright Publication*, 56 COLUM. L. REV. 185, 185 (1956) ("[P]ublication [has] . . . become a legal word of art, denoting a process much more esoteric than is suggested by the lay definition of the term."). The Act defines "publication" as the "the distribution of copies . . . of a work to the public by sale or other transfer of ownership, or by rental, lease or lending." 17 U.S.C. § 101. And "'merely posting a digital file' on the Internet"—as Norris did here—"does not amount to 'publication' under the Copyright Act." *McLaren v. Chico's FAS, Inc.*, No. 10 Civ. 2481 (JSR), 2010 WL 4615772, at *4 (S.D.N.Y. Nov. 9, 2010). As a citizen of the United Kingdom, Norris is not required to register before initiating an infringement action to protect these unpublished works. Even if the works were considered published, the second exception—for non-U.S. citizens' foreign works—would likely apply. Defendants have not pointed to evidence on which a jury could find that the works, if published at all, were "first published . . . in the United States" or published "simultaneously in the United States" and elsewhere. 17 U.S.C. § 101. Norris lives and works in the United Kingdom, Norris Decl. ¶ 2, and defendants have not mustered evidence of an initial or simultaneous publication in the United States. *See Moberg v. 33T LLC*, 666 F. Supp. 2d 415, 424 (D. Del. 2009) (holding that a Swedish artist's photographs, first posted on a German art website, constituted foreign works, and noting that it would unreasonable to require a foreign artist "to survey all the copyright laws throughout the world, determine what requirements exist as preconditions to suits in those countries should one of its citizens infringe on the artist's rights, and comply with those formalities, all prior to posting any copyrighted image on the Internet").

*Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998)).  To be "improper or unlawful," the

"amount of the copyrighted work that is copied . . . must be more than '*de minimis*.'"  *Castle*

*Rock*, 150 F.3d at 138 (quoting *Ringgold v. Black Ent. Television, Inc.*, 126 F.3d 70, 75 (2d Cir.

1997)).  "The unauthorized reproduction and distribution of a copyrighted work generally

infringes the copyright unless such use is specifically protected by the Act."  *Tasini v. N.Y. Times*

*Co.*, 206 F.3d 161, 165 (2d Cir. 2000).

      Copyrights are, of course, alienable, and thus subject to assignment and license.  *See* 17

U.S.C. § 201(d); *see also, e.g.*, *Cortner v. Israel*, 732 F.2d 267, 271 (2d Cir. 1984) ("It is

elementary that the lawful owner of a copyright is incapable of infringing a copyright interest

that is owned by him.").  A valid license "immunizes the licensee from a charge of copyright

infringement, provided that the licensee uses the copyright as agreed with the licensor."  *Davis v.*

*Blige*, 505 F.3d 90, 100 (2d Cir. 2007).  "The existence of a license is an affirmative defense,

placing upon the party claiming a license 'the burden of coming forward with evidence' of one."

*Spinelli v. Nat'l Football League*, 903 F.3d 185, 197 (2d Cir. 2018) (quoting *Bourne v. Walt*

*Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995)).

      **2.**      **Discussion**

      It is undisputed that, in both the Second Application (to trademark "Webcomic Name"

for comic strips) and the Third Application (to trademark "Oh No"), Goldner copied Norris's

work.  *See* Pl. 56.1 ¶¶ 48, 52; Def. Counter 56.1 ¶¶ 48, 52; *see also* Goldner Dep. Tr. at 123, 125.

The Second Application included, as "specimens . . . showing the mark as used in commerce,"

screenshots of: (1) Webcomic Name's Facebook page with two sketches of Blob and a stylized

logo; (2) Norris's Patreon account with a partially obscured three-panel comic of Blob; and

(3) the home page for Webcomic Name's Facebook shop, which featured a t-shirt with Blob's

likeness (the "oh no t-shirt"). *See* Second Application at 6–9. And the Third Application

included screenshots of: (1) the product page for the "oh no t-shirt" on Webcomic Name's

Facebook shop; (2) Webcomic Name's Facebook page; (3) two three-panel Blob comics

("Invasive" and "New Life") on Norris's website; and (4) the banner image of Blob on Norris's

website. *See* Third Application at 8–12. All agree, too, that this use of Norris's artwork without

authorization would infringe Norris's copyright. *See, e.g.*, Report at 10–11; Def. Br. at 8

(asserting that "the alleged 'copying' of material actually involves materials lawfully licensed").

The decisive issue thus is whether GB Entertainment was authorized to use these images

in its trademark applications. The Report concluded it was not, because the Collaboration

Agreement is limited to "the game and plush toys the parties intended to create." Report at 12.

As a result, GB Entertainment did not acquired rights in Norris's "existing brand and artwork,"

including the "material in the screenshots" at issue here. *Id.* Thus, no portion of the Agreement

"work[s] to convey" Norris's "copyright in unrelated preexisting work, much less the characters

themselves." *Id.* at 14.

Defendants make three objections to this aspect of the Report. First, defendants argue

that the Report neglected to consider the possibility that the images at issue were first created

after August 10, 2017, the date Goldner and Norris entered into their contract. Obj. at 8–9.

Defendants, however, have not adduced evidence on which a jury could so find. On the

contrary, the evidence is indisputable that at least some images used in GB Entertainment's

trademark applications were created before the Collaboration Agreement and thus formed part of

Norris's "existing brand and artwork." Report at 12. Examples are the two sketches of Blob on

Norris's Facebook page, a screenshot of which was included in both applications. *See* Second

Application at 7; Third Application at 9.  Those sketches were demonstrably uploaded to
Facebook on February 16, 2017, and October 5, 2016, respectively.[10]

Defendants' challenge to this aspect of the Report is overtly based on hypotheticals.
Defendants do not point to admissible evidence that the images used in the trademark
applications were created after the parties signed the Collaboration Agreement.  "*[I]f* it can be
shown that the materials were published after the agreement had been entered into on August 10,
2017," one sentence begins.  Obj. at 8 (emphasis added).  "*[I]f* these screenshots were indeed
works that were created after the Parties had entered into the Agreement," reads another.  *Id.* at 9
(emphasis added).  "[C]onclusory statements, conjecture, or speculation by the party resisting the
motion will not defeat summary judgment."  *Flores v. United States*, 885 F.3d 119, 122 (2d Cir.
2018).  This Court is "not required to draw every conceivable inference from the record in favor
of the nonmoving party, but only those inferences that are reasonable."  *Bishop v. Air Line Pilots
Ass'n Int'l,* 5 F.4th 684, 693 (7th Cir. 2021) (quoting *United States v. Luce*, 873 F.3d 999, 1005
(7th Cir. 2017)).  Here, the evidence is both ample and unitary of Norris's use of the characters
and concepts at issue from 2015 onwards.  *See, e.g.*, Norris Decl. ¶¶ 5–6; *see also, e.g.*, Third
Application at 2 (stating that the "oh no t-shirt" was first used in commerce in 2016).

---

[10] *See* Webcomic Name, Facebook (Feb. 16, 2017),
https://www.facebook.com/photo/?fbid=805656782919740&set=a.320054752815724;
Webcomic Name, Facebook (Oct. 5, 2016),
https://www.facebook.com/photo/?fbid=724130417739044&set=a.320054759482390.  These
pages are subject to judicial notice.  The date of publication of these posts "is not subject to
reasonable dispute because . . . it can be accurately and readily determined from sources whose
accuracy cannot reasonably be questioned," namely, the website to which these posts were
uploaded in the first place.  Fed. R. Evid. 201(b)(2), (d); *see, e.g.*, *Schroeder v. Volvo Grp. of N.
Am., LLC*, No. 20 Civ. 5127 (VAP), 2020 WL 6562242, at *3 (C.D. Cal. Sept. 3, 2020)
(collecting cases in which judicial notice was taken of social-media posts).

Even if defendants had adduced evidence of works created after the execution of the Collaboration Agreement, defendants' first objection to the Report would still lack merit, because it is premised on a flawed reading of that agreement. Defendants point to Section 3(C) of the agreement, which reads in full:

> ARTIST shall submit to COMPANY all sequels to the WORKS or other works using characters that appear in the WORKS and any other unrelated characters. COMPANY will take due diligence to copyright all said WORKS with the same percentages and profit splits as discussed above for future works relating to the WORKS above. If COMPANY acquires the NEW WORK, the provisions of this Agreement shall apply to the NEW WORKS.

Collaboration Agreement at 3. Defendants construe this provision, in conjunction with Section 1(A)'s assignment of "100% of the copyright" of "the WORKS" to GB Entertainment, to "make[] clear" that GB Entertainment holds the copyright in "any work created by [Norris] which uses characters" from Webcomic Name Game. Obj. at 9. Thus, defendants urge, if the artwork at issue was created by Norris after August 10, 2017, and if that artwork used "characters," like Blob, "that appear in the WORKS," then GB Entertainment holds the copyright to it and cannot have infringed.[11]  *Id.*

---

[11] Defendants' brief, however, fails to address the obvious question: What does it mean for a "character[]" to "appear in the WORKS"? At the moment, one might argue, there are no "WORKS" in which characters could have appeared—after all, neither the Webcomic Name Game nor the stuffed animals were ever "created by ARTIST." *See, e.g.*, Goldner Dep. Tr. at 75 ("[T]he [Webcomic Name] game has not been sold. It has been marketed, but it has not been sold. We have not done a mass production copy and sold it to consumers or B-to-C or B-to-B retailers."); *id.* at 142 ("[W]e haven't manufactured [the plushies] or mass manufactured."). *But see id.* at 74 ("[The Webcomic Name Game] has been developed. Development can take years. So created—created, I don't know, that's a legal term of art, but it's been in development. . . . There has been a lot of progress, but it is not completed . . . ."). On the other hand, one might argue the development of the sample Blob plush, *see* Goldner Decl. ¶ 16; Goldner Decl., Ex. 8 at 2, means that at least Blob has "appear[ed] in the WORKS" for purposes of Section 3(C). Neither of the parties' briefs, nor the Report, raise this question. As a result, the Court declines to reach it, and instead assumes for the sake of argument that the artwork at issue falls within Section 3(C)'s scope.

Aspects of Section 3(C) of the agreement are indeed broadly worded.  But defendants' sweeping construction—under which Norris would have effectively ceded to defendants the copyright interests to all future works—overlooks parts of the agreement in tension, or incompatible with, that reading.  For one, the third sentence of Section 3(C) itself makes clear that the Agreement does not categorically so apply, stating that "the provisions of this Agreement" apply "*[i]f*" GB Entertainment "acquires the NEW WORK."  Collaboration Agreement at 3 (emphasis added).   And Section 1(H) preserves for Norris "the right to pursue his Comic 'Webcomic Name' outside of the context of this agreement."  *Id.* at 1.

In contract interpretation, it is axiomatic that "[p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby."  *Kass v. Kass*, 696 N.E.2d 174, 180–81 (N.Y. 1998) (quoting *Atwater & Co. v. Panama R.R. Co.*, 159 N.E. 418, 419 (N.Y. 1927)).  "[A]n interpretation of a contract that affords a reasonable and effective meaning to all the terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect."  *Shepley v. New Coleman Holdings Inc.*, 174 F.3d 65, 72 (2d Cir. 1999).  In light of these principles, the second sentence of Section 3(C) is best read in conjunction with the third; that is, *if* GB Entertainment acquires Norris's future works, *then* it must, with due diligence, copyright those works, and split profits per the preexisting agreement.  The first sentence, which obliges Norris to "submit" work to GB Entertainment for its further consideration, and possible negotiation and acquisition, bolsters that common-sense conclusion.  Defendants' interpretation, in contrast, would short-circuit that process, or make it purposeless.  There would appear to be nothing to negotiate about (or to acquire) had Norris's title over the artworks already passed to defendants, with "the same percentages and profit splits as discussed above" applicable.  And that reading

would also effectively void Norris's contractual "right to pursue his Comic 'Webcomic Name'
outside the context of this agreement."  Collaboration Agreement at 1.  The Court thus rejects
defendants' argument that GB Entertainment is contractually immune from Norris's claim of
infringement as to works post-dating the agreement.

Defendants' second objection is that the Report ignored Section 2(D) of the contract,
which they contend authorizes GB Entertainment to use content derived from Norris's social
media and website.  Obj. at 9–10.  Section 2(D) reads in relevant part:

> COMPANY and ARTIST shall share access to all Social Media accounts with
> administrative privileges and COMPANY shall be the Domain Registrant and
> Administrator of any domains.

Collaboration Agreement at 2.  By its terms, however, Section 2(D) does not assist defendants.
It gives GB Entertainment access to Norris's online accounts; but it does not transfer ownership
over the assets therein or give GB Entertainment a license for future use of those assets.  And it
is ownership or a license that defendants require, not mere access.  *See Spinelli*, 903 F.3d at 197.
GB Entertainment's "administrative privileges" do not stretch so far.

Defendants' third objection is that Norris purportedly "knew of and approved" GB
Entertainment's use of the images.  Obj. at 10–12.  They point to a phone call in September
2017, a month after the Collaboration Agreement was executed, in which, Goldner attests, he
discussed with Norris "a daily calendar of Webcomic Name comics" that would include past
comics "published via his social media accounts," and there was "mutual excitement over the
idea."  Goldner Decl. ¶ 9.  But the parties' "mutual excitement," without more, would not grant
defendants a license.  Defendants do not identify evidence that Norris, outside of the agreement,
authorized the use of the relevant artwork in GB Entertainment's trademark applications.

Defendants thus have not offered evidence sufficient to defeat summary judgment.  *See Anderson*, 477 U.S. at 252.

The Court therefore adopts this aspect of the Report and holds that Norris is entitled to summary judgment as to the copyright infringement claim.

### B.       False Designation of Origin

The Report recommended that both sides' summary judgment motions be denied as to Norris's false designation of origin claim.  Defendants challenge the recommendation to deny their motion, arguing that the Report overlooked Norris's failure to adduce evidence sufficient to prove an essential element, "use in commerce."  Obj. at 17.

### 1.       Applicable Legal Standards

Under Section 43(a) of the Lanham Act, no person may "use[] in commerce . . . any false designation of origin . . . which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  15 U.S.C. § 1125(a)(1)(A).  To prevail, a plaintiff "must show, first, that he or she has a valid mark that is entitled to protection, and, second, that the defendant's actions are likely to cause confusion as to the origin or sponsorship of the defendant's goods."  *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 649 (S.D.N.Y. 2016) (citing *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 224 (2d Cir. 2012)).

At the threshold, however, a plaintiff must "show use in commerce" by the defendant of the plaintiff's trademark.  *Kelly-Brown v. Winfrey*, 717 F.3d 295, 305–06 (2d Cir. 2013) (citing 15 U.S.C. §§ 1114, 1125(a)(1)); *see also, e.g.*, *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009) (plaintiffs must show "defendant has made 'use in commerce' of the

plaintiff's trademark as the term 'use in commerce' is defined in 15 U.S.C. § 1127"). "The term 'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1227. To be used on goods, a mark must be "placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale." *Id.*

> ### 2. Discussion

Norris's theory of liability on the false designation of origin claim is based solely on defendants' unauthorized use of Norris's artwork in GB Entertainment's various trademark applications. *See* Pl. Br. at 15 ("Defendants' unauthorized copying of the copyrighted materials, then passing them off as their own, constitutes a false designation of origin. . . . Goldner took screenshots of Norris's works and submitted those screenshots to the USPTO, each time[] asserting that GB Entertainment was the 'owner' of each mark.").

As the Report recognized in denying Norris's motion for summary judgment, that conduct is insufficient, as a matter of law, to establish a claim for false designation of origin. "A trademark application falls outside the scope of a 'use in commerce' as defined in § 1227." *Unicorn Crowdfunding, Inc. v. New St. Enter., Inc.*, 507 F. Supp. 3d 547, 564–65 (S.D.N.Y. 2020). "Such an application seeks 'merely to reserve a right in a mark,' and does not involve goods or services sold or rendered in commerce." *Id.* (quoting 15 U.S.C. § 1227). For this reason, the Report correctly recognized that GB Entertainment's trademark applications cannot qualify as "use in commerce" for trademark purposes. *See* Report at 17.

Defendants argue, based on this point, that the Report should have gone further and recommended that the Court grant defendants' motion for summary judgment. In urging denial

of that motion, the Report noted that defendants' briefing "merely rebut[ted] [Norris's] arguments and cite[d] to no facts demonstrating that they have *not* used [Norris's] marks or passed them off as their own in other contexts." *Id.* (emphasis in original). Defendants argue that, in fact, Norris's inability to come forward with evidence of "use in commerce"—an element of the claim—entitles them to summary judgment. Obj. at 13.

Defendants are correct. Norris, the plaintiff, bore the burden of proof on each element of this claim. As such, defendants' burden, as the moving party, was to establish the absence of evidence on the "use in commerce" element, and defendants did so. "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Their brief noted that a trademark application is a "legal action taken . . . to protect intellectual property . . . , not a commercial action of advertising or selling a product," and that Norris had failed to adduce evidence of use in commerce. Def. Br. at 9. No more was required. "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial." *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001). Where a defendant can "point to an absence of proof on plaintiff's part," the plaintiff must "designate specific facts showing that there is a genuine issue for trial." *Id.* (quoting *Celotex*, 477 U.S. at 324). Norris has not done so. Norris has not adduced evidence that defendants used the relevant marks in contexts other than their trademark applications, which, Norris confirms, is the sole basis for this claim. *See* Pl. Br. at 15; Dkt. 130 ("Pl. Reply Br.") at 8–10 (arguing that defendants' "false application to the USPTO" constitutes "use in commerce").

To be sure, the Complaint alleges broader misappropriation of Norris's marks, as the Report noted. Report at 17 n.18. But at summary judgment, a plaintiff must come forward with

evidence supporting each essential element of a claim.  "A plaintiff cannot defeat a motion for summary judgment by merely restating the conclusory allegations contained in his complaint." *Contemp. Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 (2d Cir. 1981).  Instead, a plaintiff must "designate specific facts" supporting those allegations.  *Celotex*, 477 U.S. at 324.  Because Norris has not done so here, there is no "genuine issue for trial."  *Id.* (quoting Fed. R. Civ. P. 56(e)).

The Court accordingly adopts the Report insofar as it recommends denial of Norris's motion for summary judgment on the false designation of origin claim, but, departing from the Report, holds that Goldner is entitled to summary judgment on this claim.[12]

### C.      Cancellation of the '281 Mark

Defendants next object to the Report's recommendation to grant Norris' claim for cancellation of defendants' '281 Mark—the "Webcomic Name" for, *inter alia*, board games and stuffed animals—on the grounds that it has not been used in commerce.

#### 1.      Applicable Legal Standards

A trademark is "any word, name, symbol, or device, or any combination thereof " that a person uses "to identify and distinguish his or her goods . . . from those manufactured or sold by others and to indicate the source of the goods."  15 U.S.C. § 1127.  "[E]very trademark's 'primary' function" is "to identify the origin or ownership of the article to which it is affixed."

---

[12] Had defendants not satisfied their burden of production on this point, the Court would still have authority to so rule *sua sponte*.  *See, e.g.*, *Jian Yang Lin v. Shanghai City Corp.*, 950 F.3d 46, 49 (2d Cir. 2020).  "Where it appears clearly upon the record that all of the evidentiary materials that a party might submit in response to a motion for summary judgment are before the court, a *sua sponte* grant of summary judgment against that party may be appropriate if those materials show that no material dispute of fact exists and that the other party is entitled to judgment as a matter of law."  *Ramsey v. Coughlin*, 94 F.3d 71, 74 (2d Cir. 1996); *Unicorn Crowdfunding, Inc.*, 507 F. Supp. 3d at 564 & n.12.

*Jack Daniel's Props., Inc. v. VIP Prod. LLC*, 143 S. Ct. 1578, 1583 (2023) (quoting *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 412 (1916)).  Put simply, "a mark tells the public who is responsible for a product."  *Id.*

Under the Lanham Act, "any person who believes that he is or will be damaged by the registration of a mark" may file a petition for its cancellation with the Trademark Trial and Appeal Board.  15 U.S.C. § 1064.  For trademarks "not yet five years on the register, cancellation may be based on any ground in the Lanham Act that would have barred registration in the first instance."  *Patsy's Italian Restaurant, Inc. v. Banas*, 658 F.3d 254, 266 (2d Cir. 2011) (quoting 3 THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 20:52 (4th ed. 2009)).  "In any action involving a registered mark," a court may "order the cancellation of registrations, in whole or in part."  15 U.S.C. § 1119; *see also Nike, Inc. v. Already, LLC*, 663 F.3d 89, 98 (2d Cir. 2011) ("[D]istrict courts are authorized to cancel registrations, but only . . . in connection with a properly instituted and otherwise jurisdictionally supportable action involving a registered mark."), *aff'd on other grounds*, 568 U.S. 85 (2013).

To be valid, a trademark must be "use[d] in commerce."  15 U.S.C. § 1127.  "[A] person who has a bona fide intention . . . to use a trademark in commerce may request registration" of the mark.  *Id.* § 1051(b)(1).  However, "no mark shall be registered until the applicant" has filed a "statement of use . . . specifying the date of the applicant's first use of the mark in commerce." *Id.* §§ 1051(b)(3), (d); *see Imperial Tobacco Ltd., Assignee of Imperial Grp. PLC v. Philip Morris, Inc.*, 899 F.2d 1575, 1578 n.1 (Fed. Cir. 1990) ("[A]ctual use of the mark in commerce is a prerequisite to the issuance of a registration . . . .").  If a mark has not been used in commerce, it is subject to cancellation.  *See, e.g., Soc. Techs. LLC v. Apple Inc.*, No. 18 Civ. 5945 (VC), 2019 WL 6873871, at *3 (N.D. Cal. Dec. 17, 2019) (Chhabria, J.) (ordering cancellation of

trademark for lack of "bona fide use of the mark in commerce"), *aff'd*, 4 F.4th 811 (9th Cir. 2021).  "A mark is used in commerce when it is employed 'to identify . . . goods or services' sold to consumers 'in a given market.'"  *Cross Com. Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 167 (2d Cir. 2016) (quoting *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 147 (2d Cir. 2007)).

In addition, "only the owner of a mark is entitled to apply for registration."  *In re Wella A.G.*, 787 F.2d 1549, 1554 (Fed. Cir. 1986).  "If one who is not the owner seeks registration, the application must be denied and any registration which issues is invalid."  *Id.*  After all, although federal law recognizes trademarks, it "does not create" them; its role is to "help protect marks" that arise organically out of actual use in commerce.  *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142 (2015).

### 2.  Discussion

The '281 Mark for "Webcomic Name" covers "Board games; Card games; Game cards; Party games; Plush dolls; Plush toys; Stuffed dolls and animals; Stuffed toy animals; Tabletop games; Soft sculpture plush toys; Stuffed and plush toys."  Norris Decl., Ex. 8 at 1.  Because the '281 Mark was approved on December 11, 2018, *see id.*, Norris's suit, filed in June 2019, was timely initiated within the five-year window to cancel the mark "on any ground in the Lanham Act that would have barred registration in the first instance," *Patsy's Italian Restaurant, Inc.*, 658 F.3d at 266.

The Report identified two distinct grounds on which to cancel the '281 Mark.  First, it concluded, defendants' prior use of "Webcomic Name" does not constitute "use of a mark in commerce," because the words had been used "merely [to] identif[y] [an] illustration's origin and did not distinguish the goods being sold . . . from those sold by others."  Report at 20.  Second, it concluded that, although the Collaboration Agreement entitles defendants to use of

27

"Webcomic Name *Game*" as a trademark in "certain categories," it does not "convey ownership

of the more general 'Webcomic Name' mark in any category except stuffed animals." *Id.* at 21.

As such, it concluded that defendants are not the "rightful owners" of the '281 Mark in goods

other than stuffed animals. *Id.*

As to the first ground, defendants object that the '281 Mark has been used in commerce.

The sole example defendants offer is as a "bonus card" in Pretending to Grownup, one of GB

Entertainment's boardgames.  Obj. at 14.  Small print on the bottom of the card reads: "Artwork

courtesy of Webcomic Name."  Goldner Decl. ¶ 31.  Defendants' objections state that the card

has been "heavily and primarily featured in promotional products used by Golden Bell Studios to

promote the Pretending to Grownup game, such as being displayed on Amazon.com alongside

the game."  Obj. at 14.

Defendants' objections on this point need not be considered in light of the second ground

for cancellation set forth in the Report, which the Court finds persuasive.  As to this ground,

defendants respond that it is improper to analyze the '281 Mark with reference on a good-by-

good basis.  Defendants urge an "holistic" approach in which a Mark could survive on the basis

of goods which the owner is legally authorized to sell using the Mark even if the good has been

used in commerce only in connection with goods as to which the owner has no such right. *Id.* at

16.  On this theory, because defendants are the "lawful owners" of the mark with respect to

stuffed animals, which fall within IC 28, defendants are the lawful owners of the mark "within

the category as a whole." *Id.*

Here, however, defendants' ownership of the mark with respect to stuffed animals is not

enough to validate the '281 Mark.  To be sure, there is force to the conceptual point that the

proper remedy in most cases for an overbroad application may be to amend the application to

narrow its proper purview.  Although a trademark applicant must specify "the goods in connection with which the mark is used," 15 U.S.C. § 1051(a)(1); *see also* 37 C.F.R. § 2.32(a)(1)(6), an application that is overbroad as to the goods it identifies is not void *ab initio*. Rather, "an application will not be deemed void . . . absent proof . . . of a lack of bona fide intention to use the mark on *all* of the goods identified in the application, not just *some* of them." *The Wet Seal, Inc. v. Fd Mgmt., Inc.*, 82 U.S.P.Q.2d 1629, 2007 WL 458529 at *2 (T.T.A.B. 2007) (emphasis added).  In such cases, the court should, if possible, "determine as to which goods and services the applicant lacked bona fide intent, and excise the overbroad portions of the application."  *Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 875 (6th Cir. 2017); *see also* 37 C.F.R. § 2.71(a) ("The applicant may amend the application to clarify or limit . . . the identification of goods . . . .").

Here, however, amendment of defendants' application cannot cure its defects.  As the Report explained, defendants' ownership of the mark "Webcomic Name" is limited, at most, to "stuffed animals."  Report at 21.  For the amended mark to be valid, then, there would have to be evidence of use of the mark in connection with the sale of stuffed animals.  *See, e.g.*, *Ranch v. Tribe*, 78 U.S.P.Q.2d 1696, 2006 WL 802407 at *2 (T.T.A.B. 2006) ("It is clear that an applicant cannot obtain a [trademark] registration . . . for goods or services upon which it has not used the mark.").  The record evidence does not permit the finding that defendants ever used the mark to sell stuffed animals.  Defendants, in fact, concede the point.  *See* Pl. 56.1 ¶ 42; Def. 56.1 ¶ 42; *see also* Goldner Dep. Tr. 142 ("[W]e have not sold [any stuffed animals] because we haven't manufactured them or mass manufactured.").  Use of the sample Blob plush to "solicit[]" further interest in the plush in anticipation of its eventual release, *see* Goldner Dep. Tr. 140, is insufficient as a matter of law to constitute "use in commerce," *see, e.g.*, *Am. Express Co. v.*

*Goetz*, 515 F.3d 156, 161 (2d Cir. 2008) ("[T]here can be no trademark absent goods sold.");
*Buti v. Perosa, S.R.L.*, 139 F.3d 98, 105 (2d Cir. 1998) ("[M]ere advertising or promotion of a
mark . . . is insufficient to constitute 'use' of the mark 'in commerce.'").  Without use in
commerce, there is no trademark to protect.  *See Imperial Tobacco*, 899 F.2d at 1578 n.1.

 There is, in sum, no charter to amend the registration to conform it to the goods (board
games) on which the mark has arguably been used, as defendants do not own the mark with
respect to those goods.  *See In re Wella A.G.*, 787 F.2d at 1554 ("[O]nly the owner of a mark is
entitled to apply for registration.").  And there is no charter to amend the registration to conform
it to the scope of defendants' ownership of the mark (stuffed animals), as defendants have not
used the mark in commerce with respect to those goods.  Under the circumstances, cancellation
of the mark is the only available remedy.  *Cf. Kelly Servs.*, 846 F.3d at 869 (amendment is
appropriate if it can "cure" the identified defects).

 The Court therefore adopts this aspect of the Report and orders cancellation of the '281
Mark.

 **D.** **Breach of Contract and Declaratory Judgment**

 Norris claims a contract breach on two grounds: that defendants (1) engaged in
unauthorized use of Norris's trademarks and (2) failed to pay Norris under the Collaboration
Agreement.  Count Four seeks damages.  Count Five seeks a declaratory judgment that, in light
of these breaches, Norris validly terminated the Agreement.  The Report recommended denial of
both sides' motions for summary judgment on these counts.  Defendants object to the Report's
recommendation that their motion for summary judgment on Count Four be denied.

 **1.** **Applicable Legal Standards**

"To establish a contract breach under New York law, a plaintiff must show: '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'"  *Goldberg v. Pace Univ.*, 535 F. Supp. 3d 180, 192–93 (S.D.N.Y. 2021) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)).

"A party may unilaterally terminate a contract where the other party has breached and the breach is material." *Lanvin Inc. v. Colonia, Inc.*, 739 F. Supp. 182, 195 (S.D.N.Y. 1990).  To justify termination, "a breach must be . . . so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Babylon Assocs. v. County of Suffolk*, 475 N.Y.S.2d 869, 874 (2d Dep't 1984) (quoting *Callanan v. Powers*, 92 N.E. 747, 752 (N.Y. 1910)).

### 2.      Discussion

The Report recommended rejecting Norris's first theory of breach—that defendants had used Norris's trademarks "well beyond" the scope authorized in the Collaboration Agreement. Report at 22 (citing Pl. Br. at 17).  It reasoned that the agreement did not provide defendants a *license*, but instead *assigned* them various rights.  *See id.* at 21–23.  As a result, defendants' misappropriation of Norris's *other* rights could not constitute a breach of their contract.  *Id.* at 23.  Neither party filed objections to this well-reasoned conclusion, which the Court adopts.[13]

---

[13] Defendants argue that they are entitled to summary judgment because, as found by the Report, Norris's first theory of breach is not viable.  *See* Obj. at 16–17.  But summary judgment is used to resolve claims, not non-dispositive legal theories.  *See* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying . . . the part of each claim . . . on which summary judgment is sought."); *see also, e.g.*, *SEC v. Thrasher*, 152 F. Supp. 2d 291, 295 (S.D.N.Y. 2001) ("The plain language of Federal Rule of Civil Procedure 56 indicates that it is not appropriate to use summary judgment as a vehicle for fragmented adjudication of non-determinative issues.").

As to Norris's second theory—that defendants breached by failing to pay the $3,125 advance due upon delivery of the "final files" for Webcomic Name Game—the Report reasoned that it could not be resolved on summary judgment. That was because of a factual dispute as to whether Norris delivered the "final files" at all, and thus performed. *Id.* at 22 & n.21 (quoting Collaboration Agreement at 1). Norris attests to delivering the final files on October 2, 2018. Pl. 56.1 ¶ 34; *see also* Norris Decl. ¶ 19; Norris Decl., Ex. 6 at 1. Goldner attests that Norris did not do so. Goldner Decl. ¶ 23.

Defendants resist that there is a dispute of material fact. They rely on Norris's counsel's statement at argument that the delivered files "need[ed] tweaks"; thus, they argue, those files could not have been "final" within the meaning of the agreement. Obj. at 16 (quoting Tr. of Oral Arg. at 36). That is mistaken. The Collaboration Agreement distinguishes between the "final files" (upon which a $3,125 advance was due) and the "print-ready files" (upon which an additional $2,500 was due). Collaboration Agreement at 1. On the present record, it is not clear which files (if any) were sent to defendants. *Compare* Norris Decl. ¶ 19, *with* Goldner Decl. ¶ 23. And the parties have not litigated how the contractual term "final"—which the agreement does not define—would apply to the files in the form in which Norris claims to have delivered them (that is, whether the unidentified "tweaks" that remained to be made were such as to make the agreement non-final). On the present record, summary judgment on this point cannot be entered for the defense. *See Anderson*, 477 U.S. at 255.

The Court therefore adopts this aspect of the Report and denies both parties' motions for summary judgment as to Norris's contract claims.

## CONCLUSION

For the foregoing reasons, the Court grants Norris's motion for summary judgment as to Count 1 (copyright infringement) and Count 3 (cancellation of the '281 Mark), and grants defendants' cross-motion as to Count 2 (false designation of origin).  The Court otherwise denies both parties' motions.

This case will now proceed to trial on Norris's two remaining claims.  The Court directs the parties promptly to confer, and, by **September 20, 2023**, to submit a joint pretrial order consistent with the Court's Individual Rules governing jury trials.  Any motions *in limine* are due on the same date as the joint pretrial order; opposition briefs are due one week later.

SO ORDERED.

_Paul A. Engelmayer_
Paul A. Engelmayer
United States District Judge

Dated: August 24, 2023
         New York, New York

# Exhibit D

**McGuinness, Christie R.**

| | |
|---|---|
| **From:** | NYSD_ECF_Pool@nysd.uscourts.gov |
| **Sent:** | Monday, September 25, 2023 5:34 PM |
| **To:** | CourtMail@nysd.uscourts.gov |
| **Subject:** | Activity in Case 1:19-cv-05491-PAE-SN Norris v. Goldner et al Order on Motion for Extension of Time |

**\*\*EXTERNAL EMAIL\*\*** **- This message originates from outside our Firm. Please consider carefully before responding or clicking links/attachments.**

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

**U.S. District Court**

**Southern District of New York**

## Notice of Electronic Filing

The following transaction was entered on 9/25/2023 at 5:33 PM EDT and filed on 9/25/2023

| | |
|---|---|
| **Case Name:** | Norris v. Goldner et al |
| **Case Number:** | 1:19-cv-05491-PAE-SN |
| **Filer:** | |
| **Document Number:** | 157 |

**Docket Text:**
**ORDER granting [155] Letter Motion for Extension of Time. GRANTED. The joint pretrial order, and motions in limine, are due on November 2, 2023. Opposition briefs to motions in limine are due on November 9, 2023. These deadlines will not be further extended. The Court notes defendants' interlocutory appeal, filed September 22, 2023, which purports to appeal, inter alia, the Court's August 24, 2023 order, in which the Court granted in part and denied in part the parties' cross-motions for summary judgment. In general, "[t]he filing of a notice of appeal is an event of jurisdictional significance-it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." Griggs v. Provident Consumer Disc. Co., 4 59 U.S. 56, 58 (1982). A district court "retains jurisdiction," however, "during appeals of 'patently nonappealable orders.'" United States v. Salerno, 868 F.2d 524, 540 (2d Cir. 1989) (quoting United States v. Ferris, 751 F.2d 436, 440-41 (1st Cir. 1984)). There is no question that the Court's August 24, 2023 opinion is one such order. "Ordinarily, a district court's grant of partial summary judgment is not immediately appealable because it is not a final judgment." Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc., 386 F.3d 485, 495-96 (2d Cir. 2004); see also 28 U.S.C § 1291 ("The courts of appeals... shall have jurisdiction of appeals from all final decisions of the district courts of the United States...."). No final judgment has been entered as to any of Norris's claims. Nor have the**

**defendants moved for certification under Rule 54(b) of those claims the Court has disposed of. As such, the Court retains jurisdiction over t his case, and the deadlines it has set, including for the joint pretrial order, remain in force. (Signed by Judge Paul A. Engelmayer on 9/25/2023) (ate)**

**1:19-cv-05491-PAE-SN Notice has been electronically mailed to:**

Francelina Maria Perdomo    Francelina.PerdomoKlukosky@saul.com, LitigationDocketing@saul.com

Robert David Garson (Terminated)    rg@gs2law.com

Antoaneta Velitchkova Tarpanova    aatarpan@gmail.com, atarpanova@chintaperdomo.com, at@gdblaw.com

Kevin Kehrli (Terminated)    kk@gs2law.com

Kyle George Kunst    kgk@gdblaw.com, crossi@gpsllp.com

Craig S Tarasoff    craig.tarasoff@kirschniehaus.com, info@kirschniehaus.com

Christie Rita McGuinness    christie.mcguinness@saul.com, jillian.mattera@saul.com, litigationdocketing@saul.com

Gerard Patrick Fox    tnavarrete@gerardfoxlaw.com, adiaz@gerardfoxlaw.com, cquiroz@gerardfoxlaw.com, gerard-ecfs_notice@juralaw.net, hkyles@gerardfoxlaw.com, klee@gerardfoxlaw.com, lmanlapaz@gerardfoxlaw.com, lwahjudi@gerardfoxlaw.com

Ryan Dolan    rdolan@gerardfoxlaw.com

**1:19-cv-05491-PAE-SN Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1008691343 [Date=9/25/2023] [FileNumber=30145406-0] [96b5bc206e57289a1cf52c8ea6e700fceeeffce2a4065d5629749b63d32e5a200a 62ee2bf00d54131b5b45ad46099e41b5c06d7e5afc30d235dd60cad94c7968]]